259 N.W.2d 636 (1977)
In the Interest of R. D. S., a child.
John DASOVICK, Petitioner and Appellee,
v.
A. B., Respondent and Appellant, and
R. D. S., Respondent in Juvenile Court.
Civ. No. 9363.
Supreme Court of North Dakota.
November 10, 1977.
*637 Houdek & Wolberg, Bismarck, for appellant; argued by Keith Wolberg, Bismarck.
Richard L. Schnell, State's Atty., Mandan, for appellee.
Benjamin C. Pulkrabek, Mandan, as guardian ad litem.
PEDERSON, Justice.
This is an appeal by a mother (A.B.) from a juvenile court order which (after a finding of deprivation) terminated her parental rights to her son (R.D.S.). Although A.B. argued that some of the evidence which related to the finding of deprivation was improperly admitted, we construe her overall argument as challenging only the termination of her parental rights. After the broad review contemplated by § 27-20-56, North Dakota Century Code, we find that termination of parental rights is not warranted under the evidence presented. See In re R.Y., 189 N.W.2d 644 (N.D.1971).
A.B. suffers from a mental illness which has periodically required hospitalization and requires that she use medication prescribed to aid her in controlling her functioning. She has sought and received, over a period of years, assistance and counseling from her pastor, from the Memorial Mental Health Unit in Mandan, and from Morton County Social Services. At the time of the juvenile court hearing, she was a patient at the State Hospital.
R.D.S. has been represented in the juvenile court proceeding and in this Court by a guardian ad litem.
The petition which instituted the proceeding to terminate parental rights, in addition to alleging that R.D.S. is a deprived child, significantly alleges that R.D.S. (who was then almost ten years old) no longer wished to live in his mother's home. At the hearing a letter to his mother was accepted as evidence which indicates that R.D.S. has changed his mind. The letter expressed deep love for his mother and stated that he was sorry for what he had done.
On the basis of evidence not objected to, we concur in the finding that R.D.S. is a deprived child. In view of the existence of properly admitted, clear and convincing evidence supporting the finding of deprivation, we will not consider whether there was also privileged information wrongfully admitted.[1] Ordinarily, in nonjury *638 cases, all testimony offered which is not clearly inadmissible should be admitted. Beck v. Lind, 235 N.W.2d 239 (N.D.1975); Matson v. Matson, 226 N.W.2d 659 (N.D. 1975); Schuh v. Allery, 210 N.W.2d 96 (N.D. 1973).
The admissible evidence, which we have independently evaluated (and to which no objection was made), satisfies us that R.D.S. is a deprived child and that his placement in a foster home was a necessity: (1) A.B. was periodically hospitalized for mental illness; (2) A.B.'s current husband had instituted divorce proceedings and indicated no desire to care for R.D.S.; (3) A.B. had a propensity for shoplifting, even when accompanied by R.D.S.; (4) there was turmoil in the home which caused R.D.S. to react negatively at school and at home.
A mother's parental rights are paramount and have been recognized to be of constitutional dimensions, but they are not absolute rights. In re A. N., 201 N.W.2d 118 (N.D.1972); In re J. Z., 190 N.W.2d 27 (N.D.1971). See also, Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Determining what is the "best interest of the child" is not the primary question before the court in a deprivation case or one to terminate parental rights. In Interest of M. L., 239 N.W.2d 289, 295 (N.D.1976). Before parental rights may be terminated, three separate and distinct findings must be made: (1) that the child is a deprived child; (2) that the causes and conditions of the deprivation are likely to continue or will not be remedied; (3) that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral or emotional harm. Section 27-20-44(1)(b), NDCC. McGurren v. S. T., 241 N.W.2d 690 (N.D.1976); In re H., 206 N.W.2d 871 (N.D.1973). Each of the three factual findings must be supported by clear and convincing evidence. In re J. Z., supra; Interest of R. W. B., 241 N.W.2d 546 (N.D.1976).
A showing of parental misconduct without a showing that there is a resultant harm to the child is not sufficient. See footnote 2 in Bjerke v. D. T., 248 N.W.2d 808, 814 (N.D.1976), citing Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985 (1975). Evidence which compares the child-rearing skills of the mother and of the foster parents cannot alone form the basis of a finding of harm to the child, provided the mother's efforts meet minimum standards of care.
Our review of the evidence on the question as to whether the causes and conditions of the deprivation are likely to continue or will probably not be remedied leads us to conclude that the proof is far from clear and convincing, and leaves only an inference at best. Continuous efforts by social workers and counselors over an extended period could lead one to conclude that the cause of the deprivation is going to remain a life-long problem. Those efforts could also indicate that the problem is one of considerable gravity, but capable of solution. The testimony which reflected directly on the question was all optimistic and indicated that improvement had occurred and further improvement was likely.
A.B.'s husband testified that "when she got help, she did not shoplift," and "when she has no trouble with her medication, she is a pretty wonderful woman to live with." The pastor, as well as the social worker and counselor who testified, either stated that they were not qualified to give a future evaluation or expressed the idea that progress was being made. A.B.'s own testimony is that she can and has quit shoplifting, believes in God, knows she can do the right thing, and believes she can follow the doctor's orders. There is other favorable testimony: A.B. is able to deal with problems like any person; the petition to terminate parental rights and the pending divorce were in the nature of crises which *639 A.B. was able to handle; she has learned her lesson now; A.B. exercised very good judgment in committing herself voluntarily; when A.B. now has a problem, she takes her medication, prays, and seeks counseling; and A.B. now has a positive approach.
The dissent places great weight on the use of past history, expressing the view that this is "especially important and necessary if the rules of evidence are so construed as to prevent the testimony of medical personnel who could help shed more light on what the future may hold." While the trial court did refuse to hear the testimony of a medical doctor, the petition before the court alleged deprivation. Such an allegation does not bring into play the statutory abrogation of all but the attorney-client privilege as found at § 50-25.1-10, NDCC. Had the petition alleged neglect, and had the proceeding resulted from a report of child abuse or neglect, pursuant to Chapter 50-25.1, NDCC, the Rule 503 physician and psychotherapist-patient privilege would have been abrogated.
The case of In Interest of M.L., supra, discusses the question of whether we might discourage parents suffering from emotional disturbances from seeking treatment if we base a determination of deprivation upon the absence of parental control during the period of treatment. How much more discouraging it would be were we to terminate parental rights because of deprivation arising out of seeking or receiving treatment. Fault, which might be considered a factor in these proceedings, should not be found to arise out of illness, mental or otherwise.
We are not allowed to speculate as to what the psychiatrist from the State Hospital might have said about the permanence of A.B.'s mental illness if he had been permitted to testify. We are not convinced that petitioner has met the burden of showing by clear and convincing evidence that the conditions and causes of R.D.S.'s deprivation are likely to continue and will not be remedied. See In re H., 206 N.W.2d 871 (N.D.1973).
"It is no slight thing to permanently deprive a parent of the care, custody and society of a child, or a child of the protection, guidance and affection of a parent, notwithstanding that the parent has erred in the past, and especially where there is yet a possibility that the parent may later demonstrate a rehabilitation by sufficient conduct and character in accord with the accepted standards and duties of motherhood." [Emphasis added.] State v. Grady, 231 Or. 65, 371 P.2d 68, 69 (1962).
It is easy to conclude that there might be a better home than that which his mother has provided for R.D.S. It is also easy to conclude, as the dissent does, that an adoptive home, which has been carefully evaluated by competent social service agencies, could provide that better home. It is, however, very naive to think that the adoption of a ten-year-old accomplishes those same things as the adoption of an infant. No matter what this Court says or does, R.D.S. will continue to know A.B. is his mother. Her imperfections in that role may have diminished the relationship but they are vastly short of eliminating it. We must not, in a rush to find a better home for R.D.S., forget that he has grown more than halfway into adulthood under the parenting of A.B. For better or worse, he takes that experience with him.
Keeping State intervention in the matter of child rearing to a minimum, consistent with necessity, is essential to the American ideal, and compels a conclusion that temporary custody or court-directed supervision is adequate and more acceptable than permanent parental termination in this case. See Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).
The order of the juvenile court terminating the parental rights of A.B. to her son, R.D.S., under § 27-20-44, NDCC, is reversed. Because we agree with the finding that R.D.S. is a deprived child, this case is remanded to the juvenile court for disposition in accordance with § 27-20-30, NDCC, which authorizes continued supervision or the transfer of temporary legal custody. If *640 there is proof available that A.B.'s condition is permanent, further proceedings may be warranted.
VOGEL and SAND, JJ., concur.
ERICKSTAD, Chief Justice, dissenting.
I respectfully dissent.
After studying the pleadings, the transcript, the exhibits, the briefs and the material cited therein, in light of the law, I have come to the conclusion that we would be making a very serious mistake if we did not sustain the juvenile court's order terminating the mother's parental rights over the ten-year-old child in this case.
That the best interests of the child are our greatest concern is a philosophy we have expressed and repeated many times since the adoption of the Uniform Juvenile Court Act in 1969, codified under Chapter 27-20, N.D.C.C.
As early as 1971, in In re J.V., 185 N.W.2d 487, 491 (N.D.1971), this court said that the primary consideration in a proceeding brought under Chapter 27-20, N.D.C.C., for the termination of parental rights, is the welfare of the child. In In re J.V., we did not affirm the termination of parental rights for the reason that by the time of the hearing on the petition to terminate her parental rights, the mother had restructured her life so that in the view of this court she was capable of caring for a child who had been in foster home care under the supervision of the Public Welfare Board and the juvenile court. Contrast that case with the instant case where the mother admits that she has been a patient six times at the State Hospital and twice in private psychiatric facilities for mental treatment, and that she was only temporarily released from the State Hospital for a week for purposes of attending the hearing on the termination of her parental rights at the time the juvenile court considered the petition for termination of her parental rights.
It should also be pointed out that in In re J.V., the child was three years old when the difficulties were brought to the attention of the authorities, and only seven years old at the time of the hearing to determine parental rights. In the instant case, difficulties arose in the home affecting the care and control of this child from the time the child was four years old, and had not been solved as of the time the child was ten years old.
I recognize that our scope of review is broader under the Uniform Juvenile Court Act than it is under Rule 52(a) of the North Dakota Rules of Civil Procedure. Supportive of that broader scope is what we said recently in In the Interest of R.L.D., 253 N.W.2d 870, 874 (N.D.1977):
"Our scope of review of decisions made under the Uniform Juvenile Court Act (Ch. 27-20, N.D.C.C.) is broader than in other cases tried to the court and is much like our former procedure of trial de novo. § 27-20-56(1), N.D.C.C.; Rule 81(c), N.D.R.Civ.P.; In re A.N., 201 N.W.2d 118, 121 (N.D.1972). We therefore re-examine
`. . . the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. . . .' § 27-20-56(1), N.D.C.C."
I think it is very important that we recognize that, as an appellate court, we have given appreciable weight to the findings of the juvenile court.
In the Interest of K.B., a child, 248 N.W.2d 815 (N.D.1976), after acknowledging the broader scope of review, we said:
"In reviewing the files, records, and transcript we nonetheless give appreciable weight to the findings of the juvenile court. In re A.N., 201 N.W.2d 118 (N.D.1972)." 248 N.W.2d at 818.
It becomes very significant then to know what findings the trial court made and what disposition it directed. The pertinent part of the court's findings and order modified to preserve the anonymity of the parties, follows:
"NOW, THEREFORE, the Court makes the following

*641 "FINDINGS OF FACT

"1. That the above mentioned child, R.D.S., is ten (10) years of age, born February 19, 1967, to A.S.B., an unmarried woman at the time, who resides in Mandan, Morton County, North Dakota; that the alleged father of said child is M.J., who resides in the Jamestown area, Stutsman County, North Dakota; that paternity of said child has never been acknowledged or adjudicated in the manner prescribed by law.
"2. That the mother of said child, Mrs. A.B., has been arrested and convicted of crimes on numerous occasions since 1971, specifically that said A.B. was arrested and convicted of petit larceny and disorderly conduct in Dickinson, North Dakota, on July 15, 1971; was arrested and convicted for petit larceny, two counts, in Bismarck, North Dakota, on May 25, 1974; was arrested and convicted of petit larceny in Dickinson, North Dakota, on May 14, 1976, and most recently has been arrested for petit larceny in Mandan, North Dakota, on January 22, 1977; that said child, R.D.S., has been in the company of his mother when she has been arrested for shoplifting, and numerous times when she has not been arrested when she has committed the crime of petit larceny; that by reason thereof, the natural mother has directly contributed to the moral deprivation of her child, R.D.S., and has actually influenced the child to commit crimes of theft.
"3. That said child, R.D.S., has been known to the Morton County Social Services for more than three years past, as a child who consistently needs protective services and foster-home care by reason of the emotional instability on the part of the natural mother, Mrs. A.B.; that said child has been placed in foster care at least three times since 1973; that said child continues to be a deprived child without proper parental care, custody, and control and is in need of protection; that the deprivation is not due primarily to the lack of financial means of his parents, that the causes and conditions of the deprivation are likely to continue, and will not be remedied, and that by reason thereof, said child will probably suffer physical, mental, moral, and emotional harm, and that it is for the best interests of said child and of the State of North Dakota that the parental rights of the parent with respect to said child be forever terminated.
"ORDER
"From the foregoing Findings of Fact, it is hereby ORDERED:
"1. That all parental rights of the parent of said child, R.D.S., and the parent and child relationship with reference to said child, including the right to care, custody, and control of said child be, and the same are hereby, forever terminated, thereby terminating all of the parent's rights and obligations with respect to said child, and of said child to or through them, arising from the parent and child relationship, and
"2. That the care, custody, and control of the above mentioned child, R.D.S., be transferred forthwith to the Executive Director of the Social Service Board, State of North Dakota; that the Executive Director of the Social Service Board, State of North Dakota, is hereby empowered to place said child with a duly licensed child-placing agency of North Dakota, and further, that the Executive Director of the Social Service Board shall consent to the adoption of said child in a suitable adoptive home, subject to the further Order of the Court in the event that said child-placing agencies are unwilling to accept custody for the purpose of placing said child for adoption, or in the event the child is not adopted within eight (8) months from the date of this Order, and a general guardian of the child has not been appointed by the County Court."
In light of these findings, the trial court's order, and the mandate that the law places upon this court to review the evidence in a parental rights termination proceeding, giving appreciable weight to the juvenile court's findings, I shall attempt to review the transcript of this proceeding in the order in which the testimony was received.
*642 The first witness called was the ten-year-old boy whom, for the sake of anonymity, we shall refer to as "Billy". For the same reason, we shall refer to others by the use of initials when otherwise quoting from the transcript.
Billy testified that he had been with his mother on 25 or more occasions when she shoplifted, that most of the time he would take things too, that his mother knew that he was taking things, that she and he had arguments and fights at the supper table, that she was always saying that she didn't want him around and that she wanted him in foster care, that the last time he was placed in foster care, it was because he told the people at the social service department that he wanted to be in foster care. In cross-examination by counsel for his mother, Billy testified that he had written a letter to his mother after he was most recently placed in foster care, telling her how much he loved her. This letter was written after a visit with counsel for the mother.
When examined by counsel appointed by the court as guardian ad litem, he testified that he had been placed in about four different foster homes and that these placements occurred when his mother was sent to the hospital or when she went to the Dickinson hospital.
When examined on redirect by counsel for the petitioner herein, Billy said that he would be happier back in the City of Mandan, living with his mother and stepfather in a trailer court, than in a foster home south of Mandan. Previous testimony indicated that he had more friends at the trailer court and could sell papers there. It did not indicate that he was unhappy in the foster home.
The second witness was John Dasovick, the petitioner in this case, who, as a protective service worker with the Morton County Social Services, said that his office had in excess of 320 contacts with the family since it moved to Mandan in 1969. Part of Dasovick's testimony relative to the contacts follows:
"A. Some of them had to do with financial problemsbill collectors, things like that. And then there were times when A.B. was having emotional problems, and we were doing some counseling with her. We introduced homemaker services at one time. We had her involved in partial care at the Mental Health Center. And when Billy was five years old, we were in there on a daily basis. We arranged to have him placed in Kirkwood Day Care Center in Bismarck.
"Q. Why did you do that?
"A. A.B. was having some trouble with Billy, and he was a little bit agitated at home too. And it was the opinion of the people who were working with him that Billy would best benefit by being placed in a kindergarten-like center. And so we started to take him over to the Kirkwood Day Care Center every day.
"Q. Well, to your knowledge, and as a result of your contacts, Mr. Dasovick, did A.B. have any particular difficulties in caring for Billy?
"A. Yes; she did.
"Q. What were those?
"A. As Billy got to be older, he was more and more difficult for her to handle.
"Q. In what respect?
"A. In terms of discipline, in terms of mothering, understanding, she didn't seem to know how to give him proper care, other than food and clothing. For this purpose we wanted to introduce a homemaker. And at the same time, she was on medication and was having trouble taking the right amounts of medication at the specified times. The homemaker who was placed in the home also was placed there to help her regulate that medication. A.B. was also going to different doctors. As a consequence, without telling them that the other doctor was involved, some of the medications were counteracting each other and she was in a state of depression."
* * * * * *
"Q. Other than the kindergarten type matter with Billy, had you had anything *643 to do with any other temporary changes of custody from A.B.?
"A. Yes. There are several occasions when A.B. needed to be hospitalized at the State Hospital, and during these times we arranged to have Billy placed in foster care. And on approximately two or three othertwo or three other occasions, we allowed Billy to maintain his residence in his own homewhile J.B. was living there at the same time.
"Q. Now, on how many occasions were you involved in placing Billy in foster care?
"A. In foster care?
"Q. Yes.
"A. I was involved three times, counting this last one. A.B. has made a couple of placements herself, I believeduring the past summer."
* * * * * *
"Q. And on the occasions that you placed Billy in a foster home, I think you said there were three of them?
"A. Yes.
"Q. What were the three reasons that happened?
"A. On every occasion his mother was either at the psychic ward at St. A's, or at the State Hospital.
"Q. And do you know the length of time that these placements had to be for?
"A. Oh, I would say they all were approximately five to six weeks."
The next witness called was Lannon Serrano, the juvenile supervisor for Morton County. Through his testimony, exhibits 1, 2 and 3, were received in evidence without objection. Exhibit 1 indicates that the mother, A.B., pled guilty to petit larceny (shoplifting) and paid a $54 fine on July 20, 1971, and that she pled guilty to two counts of petit larceny (shoplifting) and paid a $100 fine on May 20, 1976, all in the City of Dickinson, North Dakota. Exhibit 2 indicates that A.B. pled guilty on July 11, 1974, in the City of Bismarck to the charge of petit theft and was fined $125 with $100 thereof suspended if she would seek medical help. Exhibit 3 discloses an arrest for shoplifting on the 22nd of January, 1977, within the City of Mandan, but does not disclose whether a conviction resulted therefrom.
Relative to the custody orders, Mr. Serrano testified:
"A. We have one temporary custody order dated 11-23-73, where custody was given to Morton County Social Services for a period of 30 days. The reason for that order was to give the mother time to adjust after her release from the State Hospital before caring for Billy. That particular order was also extended on 12-23-73 for another period of 30 days. On 4-16-75, another temporary order was issued to Morton County Social Services. This order being for a period of two years. And the reason for that order was the mother had been admitted to St. Alexius Psychiatric Ward. And then on June 30th, 1976, another temporary order for a period of 30 days was issued to Morton County Social Services for foster care of Billy. The reason for that order, the mother was released to the State Hospital for treatment. And the last order-2-11-77another temporary order for a period of 30 days to place Billy in a foster home and for further investigation of a deprivation in the R.D.S. case.
"Q. Were there five separate orders altogether?
"A. There would be four separate and one extension.
"Q. Okay. One of those is in force and effect at the present time?
"A. The one dated 2-11-77.
"MR. SCHNELL: I have no further questions of this witness at this time.
"CROSS-EXAMINATION
"BY MR. WOLBERG:
"Q. Mr. Serrano, how long did the order of 4-16-75 continue? You indicated it was for two years. Wasn't actual custody transferred sometime earlier than that back to Mrs. A.B.?
"A. Yes. I believe custody of the child was returned prior to the expiration of the two-year period."
The next witness called was Paul Griffin, who is a mental health counselor working *644 with the partial care unit of the Memorial Mental Health unit in Mandan.
When asked if he had had any contacts with A.B. in his professional capacity, he responded that he had some concerns in regard to the confidential relationship which existed between A.B. and himself, and A.B. and the Center. When this occurred, counsel for A.B. asserted that he had obtained a release from A.B. relating to the Mandan Mental Health Center for his purposes only. Further testimony indicated that Mr. Griffin has a degree in sociology and has nearly completed a degree in counseling and guidance. His immediate supervisor is a Mr. James Renner who was the Director of Partial Care at the Center. Mr. Renner was under the supervision of a Dr. Saxvik who is a psychotherapist. At this point counsel for A.B. objected to further testimony from Griffin as to his contacts with A.B. on the ground that the communications between Griffin and A.B. were privileged under Rule 503(a)(3) of the North Dakota Rules of Evidence.[1]
Counselor for petitioner argued that as deprivation is neglect, that Section 50-25.1-11, subsection 6 would apply requiring disclosure of the communication between the counselor and A.B.[2]
In response thereto, counsel for A.B. contended that Rule 503 of the North Dakota Rules of Evidence supersedes Chapter 50-25.1, N.D.C.C.
The juvenile court overruled the objection to the testimony on the grounds that Griffin was not a psychotherapist, nor working under a psychotherapist, and thus that Rule 503 of the North Dakota Rules of Evidence did not apply, and that the evidence was in any case admissible to prove neglect under Section 50-25.1-11(6), N.D.C.C.
I believe that the juvenile court was correct in its latter conclusion in that my examination does not disclose that the North Dakota Rules of Evidence supersede either Section 50-25.1-11(6), or Section 50-25.1-10, N.D.C.C.[3]
*645 The procedure committee notes following Rule 503 of the North Dakota Rules of Evidence do not indicate that any part of Chapter 50-25.1, N.D.C.C., is superseded. They do disclose that, among other sections, Section 50-25.1-10, N.D.C.C., was considered. It is also interesting to note that the table of "statutes superseded" contained at page 193 of the North Dakota Rules of Evidence, does not list any of the parts of Chapter 50-25.1, N.D.C.C., as superseded.
Actually, in my view, it is immaterial whether the trial court was correct in its view of the law or not, inasmuch as others testified to the same facts as Mr. Griffin and in greater detail. For that reason I will not attempt to recount in detail his testimony here.
The essence of his testimony was summarized by Griffin in his introductory remarks:
"A. The family problems related to some difficulties that she was having with her husband, J.B., arguments that they had had; A.B.'s inability to handle the situations that came up in her life, asking for some directionprimarily with Billysome questions in regard to discipline, and matters of this nature."
He did testify that in connection with recent difficulties Billy wanted to be placed in a foster home, and that A.B. had problems when she quit taking her medication or when she faced crises in her life.
The next witness called was Dr. Florante Novicio, who works at the North Dakota State Hospital in Jamestown. He had interviewed A.B. and had given her some psychological tests. When he was asked what the results of these interviews and psychological tests were, an objection was made by A.B.'s counsel. The court ruled that those results were privileged and that since no release was presented in court, that Dr. Novicio could not testify concerning them.
The next witness called was A.B.'s present husband, J.B., a man 68 years of age who provided the family income and a trailer home for the three to live in. He testified relative to threats on the part of A.B. to the effect that Billy would have to go to a foster home if he did not obey her, as follows:
"A. Well, for one thing, he would sayshe would say that if he don't settle down he would have to go to a foster home; and he would say he would rather go to a foster home than do what he is supposed to be doing. And there was no way of making him remember one thing. You had to continually tell him that every day and every day. And if we wanted him to do it, he didn't take no interest in it at all."
He further testified that A.B. had several hundred dollars with her at the time she shoplifted, and that A.B. told him when she was sick that Billy was trained for shoplifting so that Billy wouldn't have to work. When asked about his relationship with Billy, he said that it was good until last summer when for some reason Billy got it in for him, slashed the tires on his car, and ripped the doors off his stereo.
On cross-examination, he said that he had instituted an action for divorce, but that he was thinking of canceling it if A.B. and Billy could get along together. He indicated that if A.B. would take her medication he would drop the divorce proceedings.
The next witness called was Loretta Powell, who was a school social worker employed by the Mandan public school system. She testified that she had been involved with Billy since October of 1974, at which time she received a referral from the school because of concerns the school had at that time about Billy's academic functioning and some of his behavior within the school. She testified that she had many interviews with A.B. and her husband over Billy's problems, and that A.B. was unable to follow through with disciplinary suggestions on a consistent basis.
In response to a question asking for details, she testified:
"A. On several occasions there were marital problems, and on some occasions *646 there were problems between Billy and his motherwhether it be discipline problems, Billy not feeling that he should have to do something that was requested of him, concern about a lot of yelling within the home, a lot of arguing, and he said that he felt very unhappy and was very depressed.
"Q. Now, have you also counseled with Billy and reviewed his records after he has been in foster homes, or while he has been in foster homes?
"A. I have been involved while Billy has been in two foster homes.
"Q. Okay. Would you be able to compare his performance in school while he was with A.B. as it was compared to when he has been in foster care?
"A. Billy is an over-achiever. He achieves more than what his natural ability allows him to. Billy maintains pretty average grades C, C minus, right in there. While Billy has been in foster careand I can only relate to this time, because the last time was during the summer monthsBilly's grades have improved in the last month since he has been in foster care, his grades have come up one letter grade, from a C to a B.
"Q. Would that be a significant improvement from his over-all records?
"A. Right."
She further testified that in the middle of January Billy came to her and asked that he be placed in a foster home. In response to the question as to what reason he gave for such a request, she said:
"A. He stated that he could no longer live there; he could no longer put up with the arguing and the yelling, and always being degraded, and that he wanted to get out and he wanted to get out now. I explained to Billy that there were formalities that we had to go through, and I explained them to him. And he said, `What are you talking about? Do I have to wait a month? And then what?another meeting, and then another month I have to wait?'
"Q. Did you feel that Billy was being truthful with you at that time?
"A. Yes; I did. Billy was in a very nervous state. He was very upset, unable to function at all within the classroom. The school had a great many concerns regarding his behavior in school during this time.
"Q. At about that time did he go into a foster home?
"A. He went into a foster home approximately a monththree weeks to a month later.
"Q. Following that, was there an improvement?
"A. Within the classroom?
"Q. Yes.
"A. Yes.
"Q. Did he see you after that?
"A. Yes; he has.
"Q. What was his attitude and any things he related to you while he was in the foster home?
"A. He has stated that he likes the foster family; he has stated that he has a little friction with the foster sister, who is younger than he is; he was quite excited about living out on the farmthis was something new again for him. And that was about all he has stated directly to me."
The next witness called was A.B. A.B. testified that at the time of the hearing she was 37 years of age, that she was not married at the time Billy was born, that paternity had never been established, that she had attempted an abortion after she was pregnant with Billy, that she fell down and had accidents during the course of her pregnancy, that after Billy was born she wanted to give him up, that she had been a patient at the State Hospital about six times, that she could not recall that Billy had shoplifted when he was with her, that it was not true that she had said that she had trained Billy to be a good shoplifter, that when Billy gets her "mad" and doesn't do what she asks him to do, she does swear at him, that she has had several hundred dollars in her possession when shoplifting, that she had probably shoplifted about ten times, that she was caught twice shoplifting *647 when Billy was with her, and that her husband is 69 years of age.
When cross-examined by her counsel and asked why she initially wanted to give Billy up for adoption, she responded as follows:
"A. Because I thought it was going to be too hard to live in life, and I didn't want to have Billy to have hardship like I had hardship when I was growing up."
When asked if she now wanted Billy as her son, she responded:
"A. Yes; I do. Very much."
Testimony relative to her present status, follows:
"Q. Now, in relation to the last commitment. You are still in the State Hospital, are you not?
"A. Yes; that's right.
"Q. And you are here for a week?
"A. That's right.
"Q. And you were released on Monday?
"A. Right.
"Q. And you must return next Monday?
"A. Right."
When asked if she could quit shoplifting, she responded:
"A. Yes; I can.
"Q. What would it take to make you do that?
"A. Just to say I can't do it. I can't do it. Believe in God and do the right thing."
Counsel for A.B., at this point in the proceedings, called Mr. Griffin for direct examination. In response to counsel's question relative to who may have initiated the contact relating to A.B.'s latest commitment, Griffin responded:
"A. On that day that A.B. went back to the hospital, I received a phone call from her. She was upset, and she indicated that her husband J.B. had served divorce papers on her. Her statement at that time to me was, `I think I better go back to the hospital.'
"Q. In the course of your experience counseling Mrs. A.B., would you regard that as a landmark of any sort?
"A. During that time that I have been working with A.B., I would say that I feel that it indicated some good judgment on her partsome very good judgment."
In response to an inquiry concerning whether it would be easier to get along with or without Billy, Mr. Griffin said:
"A. I would say that A.B.'s point of view from our conferences and our sessions, that she views a temporary placement for Billy in a much less threatening way for her and her emotional situation than she views a temporary custody situationjust the opposite, the termination of parental rights. She views that as a very serious devastating thing for her, and the temporary custody thing in a much less threatening view."
The last witness called was Pastor Jeff Mantz of Bethel Assembly of God Church of Mandan who was called on behalf of A.B.
When asked to share his observations as to how A.B. reacted when she was faced with problems, he responded:
"A. Like I said, there is an uptightness, and a lot of it depends on her medication thatif she has been on medicationand basically a numbed response. But if she has been off the medication, especially if she hasn't been regularly attending church, it makes a lot of difference. Many times if we can pray about the situation, and get release that way, she has found an answer that way, been able to resolve them, at least in part, for the time. I was called on many, many occasions for counsel just on the phone. I think there is a real lack of knowledge as to how to confront her problems at times."
Under cross-examination, he described A.B.'s shoplifting problems as a habit and explained that A.B. became very upset with him when he asked her to have Billy return some magic rings and a pair of boots which he had stolen from the store.
He explained that when he was consulted by Billy's father over Billy's theft of the rings and the boots, he wanted Billy to take the things back but that Billy was afraid to *648 do so because his mother would not understand the idea of making it right.
The first argument made on A.B.'s behalf on appeal is that the juvenile court erred in receiving Mr. Griffin's testimony on the ground that Mr. Griffin's testimony involved privileged communication between a patient and a psychotherapist, and thus was received in violation of Rule 503 of the North Dakota Rules of Evidence.
I have responded to this contention earlier herein during the discussion of the evidence by expressing my view that it is immaterial that the court may have been wrong in its ruling on the admissibility of Griffin's testimony, for the reason that his testimony was merely cumulative and that others whose testimony was admissible had testified similarly.
In addition I would like to comment at this point that I would not restrict the provisions of Section 50-25.1-11, subsection 6, N.D.C.C., merely to reports made under Chapter 50-25.1. Rather, I believe those provisions should apply to all reports meeting the objectives of that chapter. The objectives of Chapter 50-25.1 as contained in Section 50-25.1-01, militates against such a strict construction of the chapter.
It reads:
"It is the purpose of this chapter to protect the health and welfare of children by encouraging the reporting of children who are known to be or suspected of being abused or neglected and to encourage the provision of services which adequately provide for the protection and treatment of abused and neglected children and to protect them from further harm." § 50-25.1-01, N.D.C.C.
Moving on then to the second argument made on behalf of A.B., it would appear that the argument is that on reviewing all of the evidence, "much like [the] former procedure of trial de novo" that this court could not, giving appreciable weight to the findings of the juvenile court, affirm the juvenile court.
Before parental rights may be terminated, three separate findings must be made: (1) that the child is a deprived child; (2) that the causes and conditions of the deprivation are likely to continue or will not be remedied; (3) that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral or emotional harm. Section 27-20-44(1)(b), N.D.C.C. McGurren v. S.T., 241 N.W.2d 690 (N.D. 1976); In re H., 206 N.W.2d 871 (N.D.1973). These findings must be supported by clear and convincing evidence. In re J.Z., 190 N.W.2d 27 (N.D.1971); Interest of R.W.B., 241 N.W.2d 546 (N.D.1976).
The relevant part of Section 27-20-02(5), N.D.C.C., for this case, defines a deprived child as one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian." § 27-20-02(5)(a), N.D.C.C.
In this case, the evidence is clear and convincing that Billy is a deprived child. The evidence shows that (1) A.B. has been a patient on six different occasions at the State Hospital, received care and treatment at the psychiatric wards of private hospitals, and was a patient at the State Hospital at the time of the termination hearing; (2) A.B. has a propensity for shoplifting even when accompanied by Billy; (3) there has been great turmoil in the home which has caused Billy to react very negatively at school and at home; (4) A.B.'s current husband has initiated divorce proceedings and indicates no desire to care for Billy; (5) Billy, on his own initiative, recently sought foster home care.
I therefore agree with my colleagues that Billy is a deprived child. I do not agree with counsel's argument that, as Billy still knows the difference between right and wrong, notwithstanding that he has been exposed to his mother's poor example on numerous occasions, his morals have not been affected to the extent necessary for the juvenile court to find that he is a deprived child.
*649 I regretfully disagree with my colleagues, in their conclusion that the second factor, that the causes and the conditions of the deprivation are likely to continue, has not been proved by clear and convincing evidence.
In my opinion, there is clear and convincing evidence that the causes and conditions of the deprivation are likely to continue. With regard to this aspect of the case, it is my view that the juvenile court was not only permitted to review the conditions in the child's home, dating back to a time when the child was barely four years old to the present time, but that it was required to do so, and that in light of that history, the juvenile court properly concluded that the deprivation was likely to continue.
This use of the past history to determine what the future will hold is especially important and necessary if the Rules of Evidence are so construed so as to prevent the testimony of medical personnel who could help shed more light on what the future may hold.
I also believe that there is clear and convincing evidence in regard to the third factor that the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. My view is that the juvenile court should not be required to wait until it is necessary to commit a child to the Industrial School, State Penitentiary, or for that matter, the State Hospital, before finding conditions sufficient to justify a finding that the child is suffering or will suffer serious physical, mental, moral, or emotional harm.
In my opinion, the points which the guardian ad litem made during his oral argument to this court are very significant. They are especially significant because he was acting and speaking solely for Billy's best interests as he saw them from an unprejudiced view. The essence of his argument follows:
(1) If we had been at the trial that day, we would have observed things we can not now observe from reading the cold record.
(a) We would have seen how difficult it was for Billy and the step-father to testify as they did.
(b) We would have seen how evasive A.B. was in answering questions.
(2) There is no question that Billy is deprived and that the deprivation will continue.
(3) It is unreasonable to say that Billy should be left in his home.
(4) Billy has to be taken out of his home and placed in a home where he will get a proper chance.
(5) Billy should be given help now so that he can stay out of trouble in the future.
(6) This child has a right to be raised in a proper environment.
(7) This court should sustain the ruling of the district court.
This court, in two previous cases, Interest of R.W.B., supra, and In re H., supra, cited with approval part of the opinion of State v. Blum, 1 Or.App. 409, 463 P.2d 367 (1970). In In re H., this court, in referring to State v. Blum, stated the following:
". . . that this inability of the parent will continue for time enough to render improbable the successful assimilation of the child into a family if the parents rights are not terminated. State v. Blum, supra 463 P.2d at 371." In re H., supra, 206 N.W.2d at 875.
In this case, if Billy is ever to be in a home conducive to his mental and moral health on an enduring basis, placement for adoption must be made soon. That this was a concern of the juvenile court is obvious from the court's disposition of this case. Delaying a termination decision, painful as such a decision is to make, may deprive Billy of ever having a healthful family relationship, a relationship I believe essential not only for his present, but also for his future mental health and happiness.
Giving the juvenile court's findings appreciable weight, and giving primary consideration to the welfare of the child, as we must, it is my view that the juvenile court's decision should be affirmed.
PAULSON, J., concurs.
NOTES
[1] We acknowledge the existence of some difficult questions as to the admissibility of evidence in juvenile proceedings. See Interest of R.W.B., 241 N.W.2d 546 (N.D.1976). In a deprivation case, Chapter 27-20, NDCC, requires a two-phased hearing. The same rules of evidence do not apply to both the first phase (sometimes called the adjudicatory hearing), at which the question for decision is whether the child is deprived, and the second phase (sometimes called the dispositional hearing), at which the question for decision is, what will be done for the benefit of the deprived child. It may not be significant in a deprivation case to keep the two phases separated as it would be in a delinquency case where the safeguards described in In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), apply. Perhaps unfortunately, our statutes apply the same procedural rules, regardless of the type of proceedings. There are some unfortunate inconsistencies in the language of the Uniform Juvenile Court Act (Chapter 27-20), the Child Abuse and Neglect Act (Chapter 50-25.1), and Rule 1101(d)(3), NDREv. The broad abrogation of all rights, except the attorney-client privilege (Section 50-25.1-10), cannot meet the standards of Gault if applied to the first phase of a delinquency proceeding. The North Dakota Rules of Evidence do not list any provision of either Chapters 27-20 or 50-25.1 as having been superseded, even though it might be argued that Rule 1101(d)(3) is inconsistent with the statutes. Before arguments are made that portions of Chapter 50-25.1 apply to a deprivation proceeding, there should be specific allegations in the petition that the proceedings are pursuant to that chapter and that the prerequisites of that statute are met. Procedures in Chapter 27-20 do apply to abuse and neglect cases brought under Chapter 50-25.1; however, the reverse is not true. It should also be noted that there may very well be a significantly different application of privilege rules to the child, in whose interest the proceedings are brought, and to the mother of that child. The terms "adjudicatory hearing" and "dispositional hearing" are not words from the statute, but are used by social service workers, and are recognized and meaningful terms in some courts. See In Re P. L. H., 199 N.W.2d 587, 589 (S.D. 1972), and In Interest of M.L., 239 N.W.2d 289, 293 (N.D.1976).
[1] "RULE 503. Physician and Psychotherapist-Patient Privilege.

"(a) Definitions. As used in this rule:
(1) A `patient' is a person who consults or is examined or interviewed by a physician or psychotherapist.
* * * * * *
(3) A `psychotherapist' is (i) a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction, or, (ii) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged.
(4) A communication is `confidential' if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.
"(b) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.
"(c) Who may claim the privilege. The privilege may be claimed by the patient, his guardian or conservator, or the personal representative of a deceased patient. The person who was the physician or psychotherapist at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient." Rule 503(a)(b)(c), N.D.C.C.
[2] "All reports made under this chapter, as well as any other information obtained, are confidential and shall be made available to:

* * * * * *
6. A court whenever it determines that the information is necessary for the determination of an issue before the court;" Section 50-25.1-11(6), N.D.C.C.
[3] "Any privilege of communication between husband and wife or between any professional person and his patient or client, except between attorney and client, is abrogated and does not constitute grounds for preventing a report to be made or for excluding evidence in any proceeding regarding child abuse or neglect resulting from a report made under this chapter." Section 50-25.1-10, N.D.C.C.