In the Interest of D.S., Jr., M.S., S.S., C.S., and H.S., Minor Children.

Doris HODNY, Petitioner and Appellee,

v.

L.S., Mother, D.S., Sr., Father, Respondents and Appellants.

Civ. No. 10162.

Supreme Court of North Dakota.

Oct. 20, 1982.

Vinje Law Firm, Bismarck, for respondents and appellants; argued by Richard G. Carver, Bismarck.

Patricia L. Burke, Asst. State's Atty., Bismarck, for petitioner and appellee.

PAULSON, Justice.

The parents of D.S. (Jr.), M.S., S.S., C.S., and H.S., appeal from the final order of the Juvenile Court of Burleigh County dated January 25, 1982, which terminated their parental rights to their natural children. We affirm.

D.S. [hereinafter "Donald", a pseudonym] and L.S. [hereinafter "Lori", a pseudonym] are the natural parents of all of the children. The couple was married in 1974 and at the time the termination proceedings were commenced D.S. (Jr.) was seven years old; M.S. was six years old; S.S. was five years old; C.S. was three years old; and H.S. was two years old. Donald was twenty-eight years old and has the equivalent of a high school education. Lori, who was twenty-five years old, attended special education classes while in school, but never completed high school.

It appears from the record that the family has been involved with social service agencies in the States of Montana and North Dakota since 1976. Between 1976 and 1978, the children had been removed from the custody of Donald and Lori by Montana authorities on four separate occasions. Reasons for the removals included lack of proper supervision, inadequate condition of the home, and an incident in which Donald was charged with assaulting Lori.

In late 1978, Donald and Lori moved to the Dickinson area. Stark County Social Services first became involved with the family in December of 1978 based upon a referral from the State of Montana. Between December 1978 and December 1979 Stark County Social Services received three reports of suspected child abuse and neglect. The reports basically concerned lack of supervision, inadequate clothing and food for the children, and unsafe conditions in the home as a result of poor housekeeping. Upon learning that the family was to be evicted from low-income housing for non-payment of rent, social services personnel removed the children from the home and on January 9, 1980, the care, custody, and control of the children was placed with the director of the Stark County Social Service Board for a period of two years. When the children were removed at this time, Lori appeared "unstable" and Donald threatened social service authorities with a gun.

Shortly thereafter the family moved to Hebron, approximately 35 miles from Dickinson, where Donald remained sporadically employed. Custody of the children was then transferred to the Morton County Social Service Board. Through the help of social services, the home was "winterized" in May and June of 1980. During this period an outreach worker for the Commu-

nity Action Program visited the home. She found Lori and the children lying on the floor because the family had virtually no furniture or appliances. The family was subsequently given considerable assistance in the form of food, clothing, furniture, and fuel by a variety of sources, including neighbors, a church group, and social service agencies. The family, however, failed to pay its utility bills and the electrical power was shut off. One social services worker testified that during an evening visit to the home in July 1980 she observed Donald and the children sitting in a dark room with only a candle for light. The children were then placed in foster care for one month.

The family then moved to a new residence located 13 miles south of Hebron. Rent there was more expensive, the closest neighbor was a mile and a half away, and the family had no telephone. The family also had innumerable problems with transportation. The vehicles purchased by the family were consistently unreliable. Donald testified that the reason for the move was because the Hebron home had only one downstairs bedroom and the ones upstairs were unfinished, thus posing a hazard for the children. He also testified that the electrical wiring in the Hebron home was unsafe.

Further problems befell the family at its rural Hebron residence. Testimony elicited at the hearing indicated that the children were sleeping on the floor. The home was also in a filthy condition. Garbage was piled up in the entryway and dog excrement was scattered about the floor. Dried food, dirty dishes, and soiled diapers were also left lying about. The children's toys and playbooks had all been placed in the root cellar as a means of discipline. Lori testified that the reason for the untidy condition of the house was because of the number of children in the family and the fact that she was under a doctor's care for malabsorption and allergies. Other witnesses testified that the children were often seen running around outside the home, scantily clad and rummaging through garbage cans. The children also frequently asked the neighbors for food.

During this period the family received fuel assistance from both Stark and Morton Counties, amounting to $676. Donald was also employed on a full-time basis. In early December 1980 or January 1981, it was discovered that a window was frozen open in the living room where the children were sleeping on the floor. This precipitated an inordinate consumption of fuel and by February 18, 1981, all but $70 worth of fuel assistance had been expended. Shortly after that date, Donald was boiling water on the kitchen stove while Lori was away from the home. The children were previously allowed to play in the kitchen area and "go on part of the stove". A social services worker, however, had pointed out the dangers in such activities. Donald allowed the children to play in the kitchen while the water was boiling and he was elsewhere. S.S. and H.S. received second and third degree burns when the stove which they had been climbing on tipped over, spilling boiling water on them. Because the available automobile had so little gasoline in it that he could not drive to the nearest neighbor, Donald did not seek medical assistance for the children until Lori returned with another vehicle approximately three hours later. It was also reported that on one occasion, while the parents visited the two burned children at the hospital, one of the other children was left unattended outside in their car for approximately five hours.

During this period of time Donald was employed in Dickinson. It was the usual routine for Lori to drive Donald 35 miles to work and back every day. The children were always taken along. This practice concerned social services authorities because the family would often leave early in the morning or stay in Dickinson until late in the evening, thus causing erratic sleep patterns for the children.

The family also entered into several "service agreements" with the various social service agencies it had been in contact with during the six years of public assistance. These agreements basically required that

the children be clothed properly, bathed daily, fed regularly, and properly supervised. Cooperation was reportedly "poor". Social services also encouraged the couple to speak with various counselors at the Badlands Human Services Center in Dickinson. It appears that the couple had gone in for counseling only once. Donald and Lori cited unreliable vehicles, lack of funds, and job conflicts for failure to attend the counseling sessions. Donald earned an average of $700 to $800 a month during this period, excluding public assistance. The amount of monthly salary varied, however, ranging from $973.48 in October 1980 to nothing in February 1981.

Following the scalding incident, the children were removed from the home and placed in foster care where they remain. On November 5, 1981, a petition was filed in the Burleigh County Juvenile Court requesting that the parental rights of Donald and Lori be terminated. A hearing was commenced on January 5, 1982. Paige Peterson, a school psychologist, related the results of various intelligence evaluations performed on the children. She testified that each child was functioning significantly below his or her age level.[1] She also testified that the lack of a regular sleep schedule, lack of proper nutrition, and the removal of toys and books from the children for an extended period of time would contribute to the delay in their functioning levels.

The foster parents of the children also testified that the children were very much below the normal learning capacity for their ages. The foster parent of D.S. (Jr.) and M.S. testified as follows:

"When they came, they couldn't count, didn't know basic things, didn't know their colors. You couldn't say: Go, put on your shoes. They couldn't follow through on that. They never made eye contact with you when you were talking to them. They would never answer you back when they first came.

"Now they can dress themselves and, you know, tend to most of their needs, dressing. You can say: Pick up your toys, and they can follow through with that, where before, they couldn't do that."

The foster parent of S.S., C.S. and H.S. also testified to the effect that the children were developmentally delayed but recently were showing signs of improvement. Each foster parent testified that a good rapport continued to exist between the children and their natural parents. Apparently the children were excited and happy when their parents visited.

Since the children have most recently been placed in foster care, Donald and Lori have moved to Hettinger, North Dakota. Both are employed and the couple testified that most of their previous problems have dissipated. Lori attributed some of her prior difficulties to having the welfare agencies "hanging on my back". They testified that they love their children and would attempt to find employment in the Bismarck area so the children could remain enrolled in the special educational programs available there. Donald, however, admitted that he and Lori could not care for the

---

1. D.S. (Jr.), who was tested when he was six years, seven months old, reportedly functioned at a four year, three month level and yielded an I.Q. within a mildly retarded range of ability. Previous testing performed when D.S. (Jr.) was four years, two months old indicated that he was functioning a year to a year and a half below that level. M.S., tested at six years, three months, also yielded an I.Q. within the mildly retarded range. She was diagnosed at four months below normal when tested at age two. S.S., tested at five years, one month old, functioned at a four year, seven month level in cognition; four year, eight month level in expressive language; four year, four month level in gross motor skills; and three year, seven month level in fine motor skills. C.S. was two years and eleven months old at the time of testing. He yielded a cognition score of one year and nine months. C.S. was functioning more than one year below age level in all areas. H.S., who was one year and eleven months old at the time of testing, ranged between ten months, and one year, eight months in all areas.

Ms. Peterson also testified that the delay discovered in D.S. (Jr.) and M.S. may be permanent while recovery of the delays in the younger children may be possible given adequate stimuli.

children immediately but would need more time to improve their environment. They have visited their children at least once a month and have given them Christmas presents.

Noting that there was no claim that the parents have been guilty of intentional deprivation,[2] the juvenile court summarized the contentions of the parties as follows:

"The petitioner, rather, cites a long history of involvement with this family by the social service organization, the standards found by them in the home, and the lack of progress made by [Donald and Lori] in correcting the conditions. The petitioner's position is that the situation is of long standing, and the history demonstrates that [Donald and Lori] are not willing to correct the conditions. [Donald and Lori], on the other hand, take the position, basically, that they love their children and try to take care of them as best they can, and that much of the concern of the social service agencies, though justified, has its roots in the family's poverty.

"The petitioner, however, maintains the problems encountered by the family were not due to lack of finances but to the inability of [Donald and Lori] to properly conserve the funds and resources available to them. As an example, the petitioner cites an instance in which the family was given fuel assistance and yet ran out of fuel because a window was left frozen open.

"It appears to me that the problems encountered by the family, more specifically, by the children, are due to a combination of two factors, which are: (1) the parents' inability to make sound decisions; and (2) the parents' general lack of responsibility."

On January 25, 1982, the juvenile court entered an order terminating the parental rights of Donald and Lori to their natural children and transferring custody and control of the children to the Executive Director of the Social Service Board of North Dakota for the purpose of placing the children for adoption. Donald and Lori appeal from this order.

The parents raise the following issues on appeal: (1) whether or not the juvenile court erred in finding by clear and convincing evidence that the deprivation of D.S. (Jr.), M.S., S.S., C.S. and H.S. is not due primarily to the lack of financial means of their parents, and that the causes and conditions of the deprivation are likely to continue or will not be remedied; and (2) whether or not the juvenile court, in light of the various remedies available to it, chose the course of action which served the best interests of the children.

Before addressing the specific contentions of the parties in this case, a short synopsis of the law and principles governing termination of parental rights is required.

Our scope of review of decisions under the Uniform Juvenile Court Act, found in Chapter 27–20, N.D.C.C., is governed by Section 27–20–56(1), N.D.C.C., which provides that review is based upon the files, records, and minutes or transcript of the evidence of the juvenile court. We are not limited to determining whether or not the juvenile court's findings are clearly erroneous, but are allowed to reexamine the evidence in a manner similar to the former procedure of trial de novo. *In Interest of R.A.S.,* 321 N.W.2d 468, 470 (N.D.1982); *In Interest of J.K.S.,* 321 N.W.2d 491, 492 (N.D.1982); *In Interest of L.N.,* 319 N.W.2d 801, 803 (N.D.1982). The juvenile court's findings are entitled to appreciable weight, Section 27–20–56(1), N.D.C.C., but this court is not bound by them. *Kleingartner v. D.P.A.B.,* 310 N.W.2d 575, 578 (N.D.1981). However, we nevertheless must take into account that the trial judge had the opportunity to observe the demeanor of the wit-

---

2. The testimony of the petitioner contained one reference to the possibility of an incident of sexual abuse based upon information obtained from others who heard about it from some of the children. The briefs of the parties do not address this alleged incident and thus we, like the court below, do not understand the petitioner to be arguing that sexual abuse has been proved by clear and convincing evidence.

nesses whereas we have only the cold transcript before us. *In Interest of R.A.S., supra; Kleingartner v. D.P.A.B., supra.*

The termination of Donald and Lori's parental rights in this case was premised on Section 27–20–44, N.D.C.C., which provides in pertinent part as follows:

"27–20–44. *Termination of parental rights.*—

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

\*   \*   \*   \*   \*   \*

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; ..."

■ Before a juvenile court may terminate rights pursuant to Section 27–20–44(1)(b), N.D.C.C., the State must establish the following three factors by clear and convincing evidence adduced at the hearing: (1) the child is a "deprived child"; (2) the conditions and causes of the deprivation are likely to continue or will not be remedied; and (3) by reason of the continuous or irremedial conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral or emotional harm. *In Interest of R.A.S., supra; Kleingartner v. D.P.A.B., supra.* Section 27–20–02(5)(a), N.D.C.C., defines a "deprived child" as one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for one child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of one child's parents, guardian, or other custodian; ..." We have interpreted the term "proper parental care" to mean that the parents' conduct in raising their children must satisfy the minimum standards of care which the community will tolerate. *In Interest of J.K.S., supra,* 321 N.W.2d at 493; *In Interest of L.N., supra,* 319 N.W.2d at 802.

■ Cases involving the termination of parental rights are always difficult, especially when there has been no claim of intentional deprivation. It is axiomatic that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer,* —— U.S. ——, ——, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982). Although we have repeatedly recognized that parents have a fundamental, natural right to their children which is of constitutional dimensions, that right is not absolute. *Kleingartner v. D.P.A.B., supra; In Interest of M.N.,* 294 N.W.2d 635, 637 (N.D. 1980); *Interest of R.W.B.,* 241 N.W.2d 546, 552 (N.D.1976); *McGurren v. S.T.,* 241 N.W.2d 690, 695 (N.D.1976). The primary purpose of the Uniform Juvenile Court Act is to protect the welfare of the child and, thus, the best interest of the child is one factor to be considered in determining the necessity of terminating parental rights. *Kleingartner v. D.P.A.B., supra,* 310 N.W.2d at 578–579.

■ A showing of parental misconduct without a showing that there is resultant harm to the child is not sufficient in termination cases. *Kleingartner v. D.P.A.B., supra,* 310 N.W.2d at 579; *Interest of R.D.S.,* 259 N.W.2d 636, 638 (N.D.1977). Evidence of previous abuse and deprivation may be considered in determining whether or not the deprivation is likely to continue and that the child will probably suffer harm therefrom. *In Interest of J.A.,* 283 N.W.2d 83, 93 (N.D.1979). But evidence of past deprivation is not alone enough; it must be prognostic. *Waagen v. R.J.B.,* 248 N.W.2d 815, 819 (N.D.1976). Finally, parents are entitled to a presumption of fitness, and the burden of disproving this presumption of parental fitness is on the challenger. *In Interest of M.N., supra,* 294 N.W.2d at 638.

■ Donald and Lori do not contest the juvenile court's finding that their children are deprived. Rather, they argue that the juvenile court's findings that the children's

deprivation was not due primarily to the lack of financial means of their parents and that the causes and conditions of the deprivation are likely to continue or will not be remedied are not supported by clear and convincing evidence.

With the foregoing legal principles in mind, we have thoroughly examined the files, records and transcripts of the juvenile court and we conclude that the State has met its burden of proof in this case. The deprivation of the children was not due primarily to lack of financial resources. We agree with the juvenile court that it was the irresponsibility and inability on the part of Donald and Lori to make sound decisions which caused serious detriment to the children. When the family moved to Hebron they were given considerable assistance in the form of food, clothing and furniture from neighbors. They also received fuel assistance and had their home "winterized". The family promptly moved to a home 13 miles outside of town where rent was more expensive. They had no reliable means of transportation, no telephone, and the closest neighbor was a mile and a half away. Thus, when two of the children were severely scalded, medical assistance was unavailable for a period of three hours.

During the winter months the children were allowed to sleep on the floor of a room in which the window was frozen open. This not only resulted in a premature depletion of the family's fuel assistance, but created a hazardous situation for the children. Several witnesses testified to the filthy conditions in the family's home. Garbage was piled up in the entryways and dog excrement was scattered about the floors. Dried food, dirty dishes and soiled diapers were left lying about. These conditions fell far below minimum standards of cleanliness and care and created health hazards for the children. Lori cited her ill health as the reason for the conditions of the home. We note, as did the juvenile court, that Donald also had a duty in this regard. The evidence also clearly shows that the children are functioning well below the level of their peers and that this arose from their previous home environment. These examples clearly establish that the deprivation was not due primarily to lack of financial resources, but to Donald and Lori's irresponsibility.

We also find clear and convincing evidence that the causes and conditions of the deprivation are likely to continue and will not be remedied. Although evidence of past deprivation alone is insufficient to sustain a finding of continuing deprivation, we are cognizant of the fact that the children have been removed from their parents' custody seven times during a five-year period. Between 1976 and 1978 alone, the children were removed from the home for a period of time exceeding 16 months. Donald and Lori have entered into several "service agreements" during the family's involvement with various social services agencies. However, their cooperation was consistently poor, if not nonexistent, and little improvement was shown in their care of the children. The prognosis for improvement appears bleak. Indeed, Lori testified that the reason for the improvement in the couple's current conditions was due to not having "a monkey on our back—the welfare department." This hardly evinces the prospect of a harmonious and cooperative future between the couple and the social services agencies, which have directed their efforts to assist in providing a proper environment for the children.

We are aware of the parents' contention that they have stabilized their lives since the children were last removed from their home and will soon be able to care for them. This court was presented with a similar contention in *Kleingartner v. D.P. A.B.*, 310 N.W.2d 575 (N.D.1981). The natural mother in *Kleingartner* argued that the juvenile court's finding that the causes and conditions of deprivation would continue was erroneous because she had made progress in stabilizing her life so that she could properly care for her children. The mother pointed to the fact that she had discontinued her use of alcohol, tobacco and drugs; that she had become gainfully employed; that she had become a Sunday

school teacher; and that she had been described as stable, reliable, trustworthy, and as a person working toward a goal. Affirming the juvenile court order terminating the mother's parental rights to her children, Justice Sand, writing for a unanimous court in *Kleingartner v. D.P.A.B., supra,* 310 N.W.2d at 580, stated:

"The evidence adduced at both hearings established the children's immediate need for a stable environment. In this instance the lack of a stable environment has already resulted in serious emotional and psychological problems for the children. Although evidence of the children's past unstable environment and deprivation is not alone enough to terminate parental rights, we believe that evidence, *coupled with the children's present need for a stable environment as well as the fact that Donna's stabilization has been without the stress of raising her children* and the fact that she exercised sporadic visitation between the two hearings, establishes that the causes of the deprivation are likely to continue and the children will suffer serious harm as a result." [Emphasis added.]

We also believe that the change in Donald and Lori's present conditions is directly attributable to the fact that it has occurred without the stress of raising their five children. This factor, coupled with the abundant evidence of the children's past deprivation and their present need for a stable environment clearly establishes that the causes of the deprivation are likely to continue and, as a result, the children will suffer serious harm. *Kleingartner v. D.P. A.B., supra.*

Donald and Lori also raise the issue whether or not the juvenile court, in terminating their parental rights, chose the course of action which best served the interests of the children. We believe the juvenile court did choose the proper course of action in this case. The juvenile court commented in its memorandum opinion dated January 19, 1982, as follows:

"[Donald] himself acknowledges that they are not in a position to accept these children at present. [Lori] stated she plans to leave their home in Hettinger and move to Bismarck because she has the possibility of a job in a restaurant here and can be closer to care facilities. This assertion demonstrates [Lori's] concern for the children but, at the same time, demonstrates a willingness to make an unsound decision which could only deteriorate the present family situation and result in no benefit to the children.

"In view of the love expressed by [Donald and Lori] for the children, which I think is genuine, one is naturally inclined to avoid termination of parental rights and to allow the parents the so-called one more chance. Reality, however, forces one to the regretful conclusion that placing the children back with the parents would cause a resumption of the feckless care demonstrated by them in the past. There is no other real solution than termination of the parental rights."

Based on the foregoing and our de novo review of the testimony adduced at the hearing, giving appreciable weight to the opportunity of the trial judge to observe the demeanor of the witnesses, we conclude that the juvenile court did not err in terminating the parental rights of Donald and Lori to their children.

Accordingly, the juvenile court order terminating Donald and Lori's parental rights is affirmed.

ERICKSTAD, C.J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.