185 N.W.2d 487 (1971)
In the Matter of the Termination of the Parental Rights of the Mother of J. V., a Child.
Civ. No. 8694.
Supreme Court of North Dakota.
March 30, 1971.
*488 David Kessler, Grand Forks, for mother of J. V., appellant.
Thomas B. Jelliff, Asst. State's Atty., Grand Forks, for respondents.
TEIGEN, Judge.
The mother of J.V., a child seven years of age, has appealed to this court from a final order of the juvenile court terminating her parental rights. J.V. is the youngest of five children born the issue *489 of his parents during their marriage. The oldest is seventeen years of age. The father is an alcoholic and has consented to the termination of his parental rights to J.V. The mother obtained a divorce from J.V.'s father and has now remarried. J.V.'s mother and her present husband testified that they are desirous of having J.V. in their home as a member of their family.
During the past three years J.V. has lived in three different licensed foster homes where he has been placed by the county welfare board. The original placement was made as a result of a request by his mother for the placement of all five children in the home of a neighbor. This placement occurred in June 1967. The placement was made during a time when J.V.'s mother was very nervous and upset because of the problems created by her husband's alcoholism. The family had been on public assistance for a number of years because the father had failed to provide for their support due to his problem with alcohol. Based on the mother's petition, the juvenile court entered a temporary order placing the five children in the custody of the county welfare board with authority to place the children in licensed foster homes. Later, this temporary order was extended and was still in effect at the time of these proceedings. Under the authority granted to the county welfare board, the children have continued to live in foster homes. J.V. is presently living in the third foster home since the original placement, and has been separated from his brothers. J.V.'s father has been institutionalized for alcoholism on at least ten occasions and, according to the record, is still an alcoholic. Subsequent to placement of the children, J.V.'s mother and father separated and his mother obtained a divorce in March 1968. The decree is not a part of this record; however, we were advised by counsel at the arguments that legal custody of the children was granted to the mother, subject to the juvenile court's temporary order awarding physical custody to the county welfare board with authority to place and maintain the children in licensed foster homes. During this period the children have been supported by Aid to Dependent Children grants. The mother has received no public assistance. She has supported herself by employment in a hotel as a maid.
During the period of about three years of separation, J.V.'s mother has not visited with J.V. This situation arose as a result of a decision of the county welfare board, made under the authority of the temporary order of the juvenile court, to the effect that she could not visit with J.V. except under prearranged plans and then only at the offices of the county welfare board. This arrangement was not acceptable to J.V.'s mother. The county welfare board had attempted to convince the mother that she should take treatments at a mental health center, but had been unsuccessful. This caused a breach in their relationship and the mother thereafter shunned the county welfare board. She testified that she had sought and received information regularly relative to J.V. through her older children with whom she did, on occasion, visit either at a foster home or, when permitted, in her home.
In January 1969 the director of the county welfare board filed the first petition in juvenile court seeking termination of the parental rights as to J.V. This proceeding was dismissed in April 1969 following the receipt of a request for the dismissal received from an alcoholic treatment center where the father was then receiving treatment for alcoholism.
On December 15, 1969, a second petition seeking the termination of the parental rights as to J.V. was filed. Both of these petitions were directed to the termination of the parental rights of these parents as to J.V. but not the other children. About ten days after the second petition for termination was filed, the mother married her present husband. She had given birth to a sixth child in September 1969. Her present husband admits paternity of this child and the child is a part of the family. *490 The family lives in an apartment which, according to the record, is an adequate and proper home for the family with sufficient room to accommodate J.V. The mother's husband is regularly employed and, in addition, does part-time work. He earns $480 per month. He testified that he wants to have J. V. live with them in their home. He also testified that he would be glad to have all of the children live with them and, if this is permitted, would be willing to obtain a larger home to accommodate them. A social worker, who had made an investigation of the home, testified that it was orderly, clean and adequate.
It clearly appears that the mother had a very difficult life while she was living with J.V.'s father. In June 1967, when she requested the juvenile court to temporarily place her children in a licensed foster home, she was very nervous and upset because of the circumstances as they then existed, and expressed a fear that, as a result, she might do harm to the children. It appears that since the divorce and remarriage of this mother, her condition has improved. A psychiatrist who examined the mother was called as a witness. It appears from the record that he submitted a written report to the court but this report was not made a part of the record. However, he also testified, and, according to his testimony, he concluded that the mother had a relatively low stress point. He testified that alcoholism is a common phenomenon in our society but not all people who are subject to its effect react as this mother did. He testified that she demonstrated the potentiality of loss of effectiveness and loss of emotional control under stress, which is not likely to disappear in a hurry although the circumstances may make it appear that this potentiality for disorganization is no longer present. The psychiatrist admitted on cross-examination that with a good husband as her partner instead of an alcoholic the prognosis was much better, but cautioned that if the same situation were to arise again she would behave the same way. In view of the changed circumstances we see little value in this diagnosis except as an explanation for the action taken by the mother in 1967. She unselfishly showed more concern for her children at that time than for herself.
The new husband of J.V.'s mother was also formerly married. Two children, both girls, were born the issue of that marriage and are still of tender age. The divorce was obtained by the husband but custody of the children was awarded to their mother. The father is paying $50 per month for their support.
The juvenile court, in these termination proceedings, based its order terminating the parental rights upon the finding that J.V. "was placed in the Custody of the * * * County Welfare Board by Order of the Court on the 2nd day of June, 1967, for such foster placement * * *"; that the mother "has failed to exhibit any interest in said child during the past three years that said child has been in foster care"; and "* * * is without proper parental care or control necessary for his physical, mental or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents; guardian or custodian; that the conditions and causes of deprivation are likely to continue or will not be remedied; * * *" On the basis of these findings, the court then proceeded to terminate the parental rights of both parents forever.
Section 27-20-56, N.D.C.C., provides that on an appeal from a final order of the juvenile court this court shall give appreciable weight to the findings of the juvenile court, but even though we give appreciable weight to the findings and, in fact, accept them in full, nevertheless we find that they will not support a final order of termination of the mother's parental rights.
In adjudicating the issues of parental rights with respect to children, the courts must effectuate the purpose of the *491 Uniform Juvenile Court Act (Chapter 27-20, N.D.C.C.). The primary consideration is the welfare of the child and a child may be separated from his parents only when necessary for his welfare or when it is in the interest of public safety. Section 27-20-01, N.D.C.C. An order terminating parental rights terminates all of the rights and obligations of the parent with respect to the child, and of the child to or through him, arising from the parental relationship (Section 27-20-46, N.D.C.C.), and is without limit as to duration (Section 27-20-36, N.D.C.C.).
Termination of parental rights may not be adjudicated except upon one or more of the following grounds:
"a. The parent has abandoned the child;
"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or
"c. The written consent of the parent acknowledged before the court has been given."
Section 27-20-44, N.D.C.C.
The findings of the juvenile court upon which it terminates parental rights of the mother are not based upon subsections a or c of said Section 27-20-44, N.D.C.C. They are based upon subsection b of that section. This subsection requires a finding that the child is a deprived child. A "deprived child" is defined in Section 27-20-02(5), N.D.C.C., as a child who:
"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;
"b. * * *
"c. Has been abandoned by his parents, guardian, or other custodian."
Thus the statute requires that before an order terminating parental rights may be entered under Section 27-20-44(1) (b), N.D. C.C., the child must be a "deprived child" and, secondly, that the "causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm."
It is true that during the past three years, since the placement of J.V. in a foster home by the juvenile court, he has been without parental care and control, subsistence and education. However, this situation arose because J.V. has been residing in a licensed foster home selected by the county welfare board under authority of a temporary juvenile court order by which J.V.'s mother was restrained from visiting him except at the offices of the county welfare board under prearranged conditions. During this three-year period, J.V. was provided "other care" and "control necessary for his physical, mental, or emotional health, or morals" in foster homes duly licensed by the county welfare board. The evidence establishes that J.V. has had good care during the three-year period in question, which care has been financed through the assistance of the Aid to Dependent Children program. The mother of J.V. had gone through a traumatic experience, living with an alcoholic husband who had failed to provide support for his family for a period of many years during which time they were entirely supported by public assistance programs. During this period of time J.V.'s father had been institutionalized on at least ten different occasions for alcoholism. The mother, during this traumatic period, became nervous and distraught because of the hopelessness of the situation and feared that, as a result, she might do harm to the children. In order to avoid this possibility, *492 she sought the assistance of the juvenile court and the public welfare board and, as a result, the children were placed in a licensed foster home. Under the circumstances and in view of her "low stress point", it appears to us that she exercised good judgment.
Since the remarriage of the mother conditions have materially improved. She now has a home which is suitable, and the conditions and causes of her emotional stress have been eliminated. We agree with the observation made by the trial judge when, at the close of the hearing, he stated for the record: "There is no question in the mind of the court that the parent * * * [mother] has improved and is in much better condition now than at the time when she gave up her children." The separation of the mother and her children was brought about by circumstances beyond her control and the temporary placement was no doubt in the best interests of the children. There is no evidence that J.V. has been without care and control necessary for his physical, mental or emotional health and morals during this period. In fact, the evidence establishes that he has been well cared for. It is our conclusion that the evidence does not support a finding that J.V. is a "deprived child" as defined in Section 27-20-02(5), N.D.C.C.
The legislature has noted a strong preference for parental guardianship. Section 27-20-01, N.D.C.C., which lists the public purposes of the Act, directs:
"3. To achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only when necessary for his welfare or in the interest of public safety."
The Minnesota Supreme Court phrased this preference well when it stated:
"It is too well settled to require citations that the right of a parent to the custody of a child is paramount or superior to that of any other person; that a mother is presumed to be a fit and suitable person to be entrusted with the care of her child; and that the burden of disproving this presumption rests upon the person challenging it." In re Larson, 252 Minn. 490, 91 N.W.2d 448 at 453.
We find that the petitioner failed to sustain the burden of proof that the parental rights of J.V.'s mother should be terminated. We must reverse the order. We also recommend that the juvenile court, after a proper hearing, consider the termination of its temporary order placing the custody of J.V. in the county welfare board. It was argued that J.V. has adjusted well to his present foster home and that because of his prolonged absence from his mother he will suffer shock if he is returned to her. If the juvenile court determines that the sudden transfer of J.V. from the foster home where he now lives to his mother's home may produce a temporary shock and be a painful transition because he has not seen her for a period of three years, we believe that this can be avoided if the mother is permitted to visit him in the foster home and J.V. is permitted to visit his mother in her home before the transfer is made. We believe that such visits will result in a progressive rehabilitation as mother and child re-establish the family relationship.
The order terminating parental rights of the mother is reversed.
STRUTZ, C. J., and ERICKSTAD, PAULSON and KNUDSON, JJ., concur.