Stanley M. WAAGEN, Director, Stutsman County Social Service Board, Petitioner, Appellee,

v.

R. J. B., Respondent, Appellant.

In the Interest of K. B., a child.

Civ. No. 9217.

Supreme Court of North Dakota.

Dec. 23, 1976.

Burt L. Riskedahl, Bismarck, for respondent and appellant.

Georgia M. Pope, Asst. State's Atty., Jamestown, for petitioner and appellee.

SAND, Justice.

This appeal arises from an order of the juvenile court of Stutsman County terminating the parental rights of the mother of Baby K.

The mother, RJB, was 25 years old and unmarried at Baby K's birth on August 12, 1975. RJB had been a patient at the North Dakota State Hospital at Jamestown for treatment of drug addiction from April until June 1975, when she returned briefly to her parents' home in Mandan. One month before the baby's birth, RJB returned to the State Hospital, where Baby K was born. Following the birth of the child, the juvenile court of Stutsman County, the Honorable M. C. Fredricks, signed an order giving the Stutsman County Social Service Board temporary custody of Baby K. On August 18, 1975, both mother and Baby K were placed in a supervised setting in the home of a Jamestown couple, an arrangement initiated by the State Hospital. Early on the morning of September 4, 1975, RJB was returned to the State Hospital by a social worker. RJB had voiced intentions to leave that day for Grand Forks to take care of some divorce papers, and when told by the social worker that she could not take Baby K with her, had become agitated and upset. Later that morning RJB left the State Hospital without authorization, whereupon recommitment and police pick up were ordered. The social worker removed Baby K from the supervising home and placed her in emergency care. RJB has not had custody of Baby K since that time. Since prior to trial Baby K has been in the home of a prospective adoptive couple. The child's natural father has not legitimated nor claimed custody rights to Baby K. The director of the Stutsman County Social Service Board petitioned to terminate the parental rights of RJB to Baby K, and a hearing was commenced on October 13, 1975. After partial presentation of the evidence, the hearing was recessed, resumed, then concluded on January 5, 1976. An order was signed on that date terminating RJB's parental rights, and it is from that order that RJB appeals.

■ Parental rights may be terminated under § 27–20–44, North Dakota Century Code, only when the following circumstances exist:

"a. The parent has abandoned the child;

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or

"c. The written consent of the parent acknowledged before the court has been given."

The applicable portion of this statute is subsection (1)(b), which requires three separate and distinct findings. *McGurren v. S. T.*, 241 N.W.2d 690 (N.D.1976); *In re H.*, 206 N.W.2d 871 (N.D.1973). These requirements, without giving them any priority, are:

(1) It must be established that the child is deprived. "Deprived child" is defined in § 27–20–02(5), NDCC, as a child who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;

"b. Has been placed for care or adoption in violation of law; or

"c. Has been abandoned by his parents, guardian, or other custodian."

(2) There must be a finding that the conditions and causes of deprivation are likely to continue or will not be remedied; and

(3) That as a result, the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.

The trial court found that all three requirements were established based on the evidence presented.

Joan Martin, a social worker who testified on behalf of the Social Service Board, had met with RJB several times prior to Baby K's birth and regularly after the birth. When she retrieved Baby K from the supervising home the day RJB left for Grand Forks, the baby appeared to her to

be chilled and hungry. The social worker noted in conversations she had with RJB that RJB's thought pattern and behavior were unrealistic. Based on her observations over a two and a half months period, she recommended termination of RJB's parental rights.

Dr. McNichols, a board-qualified psychiatrist and clinical director of the Alcoholic and Drug Division at the State Hospital, had seen and treated RJB at the Hospital regularly since her first admission in 1972 when he diagnosed her as having schizophrenic reaction, chronic indifferentiated type. He saw her several times after the birth of Baby K and found her condition to be unchanged; she was still confused, impulsive, and unrealistic. He testified that the increased responsibility of a baby was taxing her "limited resources" and that the best prognosis that could be given would be that RJB might some day recover sufficiently to care for herself. He did not foresee improvement in her condition for many years, perhaps a lifetime, and felt improvement would be less likely if she had the additional concern of caring for a child.

RJB's mother testified that she and her husband would be willing to take custody of Baby K and RJB, but that she did not want to be "tied down" and would not take the infant if there were an alternative open other than termination of RJB's parental rights and adoption.

Steve Laudon, a certified addiction counselor at the State Hospital, observed RJB while she was a patient at the Hospital, although she was not assigned to him for treatment. He testified that she appeared to be initially withdrawn but later became more lively and outgoing and was making satisfactory progress in treatment. With continued supportive services, counseling, and chemotherapy, he believed that she could function in society and care for her child as well.

In addition to oral testimony, the written reports of two Bismarck psychiatrists were offered into evidence. Dr. A. F. Samuelson, who evaluated RJB shortly before Baby K's birth, gave a guarded prognosis and diagnosed RJB as manifesting an antisocial personality, schizophrenia in remission, and drug and alcohol dependency, improved. A second examination showed the schizophrenia to be worsened, and hospitalization was recommended. Dr. A. J. Candy evaluated RJB four months after the birth of Baby K, when she diagnosed her as having a passive-aggressive personality, passive dependent type, with little or no residual symptoms of schizophrenia. Probably the most favorable of the psychiatrists' reports, Dr. Candy's statement at best could only recommend that custody of Baby K be placed with RJB's mother, with eventual custody to RJB if she was able to document a reasonable period of stability. Counsel for RJB stated at the conclusion of the hearing that "It is very obvious Dr. Candy is not foolhardily endorsing the placing of the child with [RJB]."

Other information was examined by the trial court at the hearing, some of it through RJB's own testimony, including the fact that she had appeared before the trial judge on several criminal charges. RJB also testified that she was working part-time while living with her parents and was making efforts to qualify herself for a clerical or secretarial position. It will serve no useful purpose to discuss with particularity all of the evidence presented to the trial court. We have, however, made careful independent appraisal of the entire record. Under Chapter 27–20, NDCC, our broad scope of review entitles the appellant to the equivalent of a trial de novo. In *Interest of M.L.*, 239 N.W.2d 289 (N.D.1976). In reviewing the files, records, and transcript we nonetheless give appreciable weight to the findings of the juvenile court. *In re A.N.*, 201 N.W.2d 118 (N.D.1972).

We start with the fundamental premise that a natural parent has a right to custody of her child. This right is a paramount one, in order that the integrity of the parent-child relationship be carefully guarded. But the right is not absolute or unconditional. *In re A.N., supra ; In re J.Z.*, 190 N.W.2d 27 (N.D.1971). Any doubts should be resolved in favor of the natural

parent, and a child should be separated from his parents only when necessary for his welfare or in the interest of public safety. *In re J.Z., supra* ; § 27–20–01(3), NDCC. Because RJB did not consent to termination of parental rights, nor did she abandon the child, her right to custody of Baby K cannot be ended unless we find Baby K deprived under § 27–20–02(5), NDCC. The trial court based its finding of deprivation on § 27–20–02(5)(a), which reads:

". . . a child who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;"

■ It has been clearly established by this court that a finding of deprivation can be made even where the parent has not had custody of the child. *McGurren v. S.T.*, 241 N.W.2d 690 (N.D.1976); *In re H.*, 206 N.W.2d 871 (N.D.1973). Such a finding can be made if there is sufficient prognostic evidence to show that the parent is presently incapable of providing parental care, and that her inability to provide proper care will continue long enough to make it improbable that the child could be successfully assimilated into a family if parental rights are not terminated. *In re H., supra.*

■ It is argued that such action is an undue infringement on the rights of a natural parent, and that a child cannot be lacking proper parental care or control if she or he is not even in custody of the parent. But a child should not have to be subjected to actual deprivation before custody is given to the juvenile court. A termination proceeding is preventive as well as remedial. *In re Scarlett*, 231 N.W.2d 8 (Iowa 1975); *In re H., supra.* Requiring a court to place a child with a parent in order to determine whether proper care and control will be provided might in some circumstances prove detrimental, or even fatal, to the child. In order to avoid serious risk to the child, a more appropriate means to protect parental rights is the requirement that deprivation be shown by clear and convincing evidence. Section 27–20–29, NDCC; *In the Interest of M.L.*, 239 N.W.2d 289 (N.D. 1976). See also, *In re DeSavage*, 360 A.2d 237 (Pa.Super.1976). In *In re H., supra*, where the mother was sixteen and a half years old, unmarried, and under control of the State Youth Authority at the time of the baby's birth, the prognostic evidence was found to be clear and convincing in establishing that the child was deprived. The case was remanded, however, for additional prognostic evidence on whether that deprivation was likely to continue.

■ Counsel for RJB concedes that upon clear and convincing prognostic evidence a child can be found deprived even when not in custody of the parent, but argues that the evidence cannot be clear and convincing when the parent does not have custody and the expert testimony is conflicting. In termination proceedings, however, as in all other cases, the weight to be given expert testimony is a matter to be determined by the trier of fact from all circumstances appearing in the evidence, and the trier of fact must try to reconcile conflicting evidence, or if he cannot, then affix his own value to it. *Grenz v. Werre*, 129 N.W.2d 681 (N.D.1964); *Klundt v. Pfeifle*, 77 N.D. 132, 41 N.W.2d 416 (1950). But in the instant case, it is questionable whether there was a substantial conflict in the testimony presented. Not even the most favorable evidence supported a conclusion that RJB is presently capable, on her own, of providing proper parental care for Baby K. Steve Laudon testified that RJB could probably care for her child, but only if she received continued counseling, drug therapy, and other supportive services. None of the psychiatrists who testified advocated that Baby K be placed with her mother. The alternative suggested by Dr. Candy, that Baby K and RJB be placed in the custody of RJB's parents, is not a satisfactory one. RJB's mother has already raised seven children of her own and is admittedly not eager to take in another baby. She is willing to take the

child for her daughter's sake but is not enthusiastic about it. Because she and her husband were able to exert little control over RJB while she was younger, it is probable that if problems were to develop over the care of Baby K in their home the effect of their supervision or direction would be minimal. In addition, this arrangement does not provide the permanence or stability that Baby K needs, as it is based on the rather slim hope that RJB will make a speedy recovery and equip herself to provide for Baby K. The importance of stability for the child within a reasonable period of time was emphasized in *Teeter v. Pruiksma*, N. Y. Family Court, 11/14/1975,[1] where the three-year-old daughter of an unwed mother was found deprived and was removed from her mother's custody. The mother had voluntarily left the child in custody of state social services two and a half years before. Psychiatrists testified that the mother suffered a mixed character disorder with impulse-ridden features, and that she could not be a fit parent because of her own chaotic background, dependency, and sense of inadequacy. If she could in the future acquire the capacity to be an able parent, the court found, it would be too late for the child, who needs a stable home now.

▆ Our independent appraisal of the record in this case provides clear and convincing evidence that RJB is not presently able to provide proper parental care and that her problems are in all likelihood long-term. The prospects for recovery from her mental illness are slight, and the cause of Baby K's deprivation is likely to continue. Furthermore, the evidence demonstrates that RJB may have difficulty convalescing to the point where she can manage her own life.

▆ We hasten to add that acceptance of treatment for mental illness or emotional problems by a parent does not auto-

matically render a child deprived. See *In Interest of M.L.*, 239 N.W.2d 289 (N.D. 1976). Indeed, RJB is to be commended for her cooperation with treatment programs and her sincere desire to change her life. But where a child is concerned it is not enough to demonstrate a desire to improve. RJB has only just begun on the road to recovery, and treatment thus far has not resulted in much progress. RJB must be able to demonstrate present capability, or capability within the near future, to be an adequate parent. This she has not done. In *In re H., supra*, at 874, where a child was found deprived, this court distinguished the case of *In re J.V.*, 185 N.W.2d 487 (N.D. 1971), in which a mother who had relinquished custody of her child due to emotional instability was re-awarded custody of the child because she "offered concrete evidence of her rehabilitation and of her present ability to provide proper parental care." And in *In Interest of M.L., supra*, at 295, where a mother had received psychiatric treatment including involuntary commitment to a hospital, this court found that "the evidence . . . clearly shows that the mother was rehabilitated and the court so indicated in its findings." We encourage RJB's continued participation in treatment programs, but are obliged to hold that because she has not shown herself to be rehabilitated or likely to be rehabilitated her parental rights must be terminated. Baby K, now 15 months old, needs parental care and control which RJB cannot provide. She is not likely to be able to provide it in the future, and as a result Baby K would probably suffer serious physical, mental, moral, or emotional harm were she to remain in her mother's custody. The trial court was correct in terminating RJB's parental rights.

▆ We are acutely aware of the harshness of a step which permanently separates a parent from her child. But in termination of parental rights the primary consid-

1. This case apparently as of now is not reported in the New York Supplement and may be found in 2 Family Law Reporter 2041. The two prior reported hearings appearing on this same case at 47 A.D.2d 101, 364 N.Y.S.2d 656 (1975),

and 82 Misc.2d 88, 367 N.Y.S.2d 629 (Fam.Ct. 1975), involve the same child and litigants but do not deal with the same issue and are concerned with the necessity of a hearing on fitness.

eration is and must be the welfare of the child. *In re J.V.*, 185 N.W.2d 487 (N.D. 1971); § 27–20–01, NDCC. Baby K has been adjudged a deprived child because her natural mother is presently incapable and most likely will continue to be incapable of providing suitable care and support for Baby K. The needs of this child must take priority over the wishes of the mother. Baby K is now in custody of a couple who wish to adopt her, and it is in the child's best interest that the parental rights of her mother be terminated so that adoption proceedings may be commenced and completed promptly.

 Counsel for RJB argued that failure to appoint a guardian ad litem in the instant case jeopardized the substantial rights of Baby K, and that no one at the termination proceeding represented the child's interest. Section 27–20–48, NDCC, states as follows:

> "The court at any stage of a proceeding under this chapter, on application of a party or on its own motion, shall appoint a guardian ad litem for a child who is a party to the proceeding if he has no parent, guardian, or custodian appearing on his behalf or their interests conflict with his or in any other case in which the interests of the child require a guardian. A party to the proceeding or his employee or representative shall not be appointed."

We do not think that under the statute the appointment of a guardian was mandatory in the instant case, and hold that the child's interests were adequately protected. We add, however, that the appointment of such a guardian could be extremely beneficial. The dispositions that must be made in cases involving termination of parental rights or questions of custody are difficult ones, often requiring that we evaluate factors practically incapable of measurement. A guardian ad litem can assist in clarifying these factors and in bringing other matters concerning the child's best interests to the court's attention. If any doubts exist in the mind of the judge whether or not a guardian ad litem should be appointed, the doubt should be resolved in favor of the appointment.

For the reasons stated in this opinion, the judgment of the juvenile court terminating RJB's parental rights to Baby K is in all things affirmed.

ERICKSTAD, C. J., and VOGEL, PEDERSON and PAULSON, JJ., concur.