In the Matter of the ADOPTION OF Donavon Ray GOTVASLEE and Dayton John Gotvaslee, Minors.

Darrel Rae GOTVASLEE and Glenda Ann Gotvaslee, Petitioners and Appellees,

v.

Douglas Ray HOFFERT, Respondent and Appellant,

and

T. N. Tangedahl, Executive Director of the Social Service Board of North Dakota, Respondent.

Civ. No. 9936.

Supreme Court of North Dakota.

Nov. 12, 1981.

Farhart, Rasmuson, Lian & Maxson, P. C., Minot, for respondent and appellant; argued by Judith E. Howard, Minot.

McGee, Hankla, Backes & Wheeler, Minot, for petitioners and appellees; argued by Orlin W. Backes, Minot.

PAULSON, Justice.

This is an appeal from a judgment of the District Court of McHenry County terminating the parental rights of Douglas Ray Hoffert, respondent-appellant, in and to the minor children, Donavon Ray [Hoffert] Gotvaslee and Dayton John [Hoffert] Gotvaslee. The judgment was issued in connec-

tion with an adoption proceeding initiated by the children's mother, Glenda Ann Gotvaslee and her husband, Darrel Rae Gotvaslee, petitioners-appellees. The basis for the judgment was that Douglas Ray Hoffert had abandoned his children. The appeal contends that the evidence was insufficient to establish abandonment. We affirm.

The evidence shows that Douglas Ray Hoffert and Glenda Gotvaslee were formerly husband and wife. Two children were born of their marriage, namely, Donavon Ray, born January 9, 1973, and Dayton John, born August 12, 1974. The parties were married on June 23, 1972. They separated in June, 1975, and were divorced on July 22, 1976. The decree of divorce gave custody of the two minor children to Glenda. Douglas was given reasonable visitation rights and was ordered to pay $100 per month child support for the two children.

From the time of the parties' separation in 1975 to 1980 Douglas had two visitations with the children, one of which took place on December 24, 1976, which was arranged by a telephone call made that same day; and another, a 2-day visitation, which took place in the spring of 1977.

Following Douglas's visit in the spring of 1977, there were three attempted contacts with the children. In August of 1977, Douglas initiated an attempted visitation with the children by asking his friend, a Mr. Osborne, to pick up the children from Glenda and take them to Fargo, where Douglas was living, with no prior arrangement or agreement with or notice to Glenda. When Mr. Osborne called her on the telephone, Glenda refused to let the children go with him and informed Mr. Osborne that Douglas should contact her to arrange visits. The second attempted visitation was in December, 1978, when Douglas's second wife, Delores Hoffert, telephoned Glenda to ask what the children wanted for Christmas and to state she and Douglas wanted to see the children. Glenda refused to arrange a visitation through Delores and requested

that Douglas himself should contact her to arrange visits with the children. The testimony surrounding the incident after that phone call is unclear. Delores testified that Glenda had told her that Douglas should contact Glenda that night to arrange a visit, and that Douglas called that night but no one answered. Glenda testified that she told Delores to have Douglas call her and if he would contact her, he could see the children. She did not remember telling Delores to have Douglas call that night. She further testified that Douglas made no attempt to call her. Douglas testified that his reason for making no attempts afterwards were that Glenda's refusals were emotionally upsetting to him.

There were no more attempted visitations until August, 1980, two weeks prior to the adoption hearing. Glenda refused visitation to Douglas upon advice of her counsel, pending the outcome of the adoption proceedings which had already begun.

No Christmas or birthday cards or gifts were sent to the children from 1976 to August, 1980. On August 12, 1980, a birthday card was sent to Dayton John after the adoption proceedings had commenced.

Prior to the fall of 1978, Douglas was sporadically employed with one period of unemployment lasting six months. He generally made his child support payments during his periods of employment after his divorce from Glenda. He was, however, generally in arrears until September, 1977, at which time he made a $450 payment to clear up his arrearages. Prior to September, 1977, he was subject to two contempt citations and a bench warrant for non-payment of child support. On October 19, 1977, Douglas made a $50 support payment and made no further support payments for 16 months until January 29, 1979.[1]

Between July, 1977, and October, 1978, Douglas had moved four times within North Dakota and was employed steadily in Washburn in the fall of 1978. During the 6-month period of unemployment, he lived

---

1. Following January 29, 1979, Douglas was subject to a total of two contempt citations and three bench warrants, which were preceded by the issuance of several arrearage notices sent by the clerk of the district court to him.

part of that time on his parents' farm near Granville, approximately twelve miles from where the children lived with their mother, and he made no attempt to visit the children during that time.

Between October, 1977, and January, 1979, Douglas made no support payments for his minor children, even though he was employed for part of that period of time. On January 29, 1979, Douglas was ordered by the District Court of McHenry County to pay monthly the sum of $100 for child support along with $50 per month toward $1,550 in arrearages. The court further ordered that should Douglas become in arrears, the clerk of court was to notify the sheriff who was to immediately take Douglas into custody and hold him for an appearance before the court, at which time Douglas would be required to serve a six-month sentence imposed by an earlier court order dated August 19, 1976, which court order was also for arrearages in support payments. After the January 29, 1979, order Douglas regularly made his payments of $150 per month, including the payment in August, 1980, when the adoption matter was heard and at which time his arrearages were $550.

The Gotvaslees' petition for adoption was brought without the consent of Douglas on the basis of § 14–15–06(1)(b) of the North Dakota Century Code (Revised Uniform Adoption Act), which provides, in part, that consent to adoption is not required of a parent who has abandoned a child or a parent of a child in the custody of another, if that parent for at least one year has failed significantly without justifiable cause to communicate with the child or provide for the child's care and support as required by law or by judicial decree. The adoption was commenced with service upon Douglas on February 14, 1979. The hearing was set for February 26, 1979; however, the 20-day notice requirement had not been met and counsel for the petitioners, the Gotvaslees, canceled the hearing. The adoption hearing was later set for August 25, 1980.

At the adoption hearing, Douglas argued that his parental rights had to be terminated before the adoption could take place without his consent. He cited *Bond v. Carlson*, 188 N.W.2d 728 (N.D.1971), in which the North Dakota Supreme Court stated that an adoption should not be granted in the absence of consent of a natural parent unless the evidence establishes ground for termination of parental rights or the parent was adjudicated unfit in divorce proceedings. The Gotvaslees, on the other hand, argued that the Revised Uniform Adoption Act, § 14–15–06(1)(b), N.D.C.C., was applicable and that Douglas's consent to the adoption was not required because he had failed significantly for at least one year to communicate with or support his children without justifiable cause. The trial judge agreed with Douglas's reading of the interplay of the Revised Uniform Adoption Act with the Uniform Juvenile Court Act and he stated, at the close of the termination hearing, that "abandonment or some other basis must be shown and that parental rights must be terminated before an adoption can be granted in this matter". Subsequently, the district judge determined that Douglas had abandoned his children, thereby constituting ground for terminating his parental rights. The petition for adoption was granted the next day, August 26, 1980.

This appeal is from the trial court's determination that Douglas had abandoned his children. The only issue raised by Douglas is whether or not the trial court erred in its findings of fact and in its conclusion that Douglas had abandoned his children. Douglas argues, essentially, that his support payments and his two visits and his attempted visits with his children indicate that he did not intend to abandon his children.

At the outset we first must explain the framework within which we are reviewing this appeal. This court has not yet specifically decided whether the Uniform Juvenile Court Act, Chapter 27–20, N.D. C.C., or the Revised Uniform Adoption Act, Chapter 14–15, N.D.C.C., controls our scope of review regarding termination of parental rights in connection with adoption proceed-

ings. Both Chapter 27–20 and Chapter 14–15, N.D.C.C., provide for termination of parental rights on the basis of abandonment. § 27–20–44(1)(a) and § 14–15–19(3), N.D.C.C. Decisions under the Uniform Juvenile Court Act are subject to review similar to the former procedure of trial de novo. *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575 (N.D.1981). However, in the instant case, there has been raised no issue regarding our scope of review. At oral argument both parties agreed that our scope of review is governed by Rule 52(a) of the North Dakota Rules of Civil Procedure because the proceedings were pursuant to Chapter 14–15, N.D.C.C., and not under Chapter 27–20, N.D.C.C. Therefore, our scope of review for this appeal will be governed by Rule 52(a), N.D.R.Civ.P., but even if we were to review this appeal de novo, under the Uniform Juvenile Court Act, we would reach the same result.

In an adoption proceeding, the petitioners bear the burden of proving the underlying facts supporting the adoption. *Boslund v. Rice*, 179 Wis. 531, 192 N.W. 56 (1923). In the instant case, the Gotvaslees attempted to prove that termination of Douglas's parental rights should be granted on the ground of his abandonment of his children.

This court recognizes that the relationship between a parent and a child is one of the strongest and most basic relationships that human beings enjoy. Severing this relationship by the State requires careful action by the State, mindful of the consequences in the light of all the circumstances. In *Kottsick v. Carlson*, 241 N.W.2d 842, 850 (N.D.1976), the North Dakota Supreme Court quoted with approval from *Beltran v. Heim*, 248 Md. 397, 236 A.2d 723, 725 (1968), which stated:

> " 'Unlike awards of custody . . . adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as

far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.' "

A parent's right to the custody and companionship of his or her children is recognized as one of constitutional dimensions, although not absolute. In *Interest of M.N.*, 294 N.W.2d 635 (N.D.1980); *Jacobson v. V.S.*, 271 N.W.2d 562 (N.D.1978). This is a basic premise of cases involving termination of parental rights.

We are here faced with an issue of abandonment. Proof of having abandoned a child is sufficient to establish deprivation for purposes of terminating parental rights under § 27–20–44(1)(a), N.D.C.C. *In Interest of F.H.*, 283 N.W.2d 202, 211 (N.D.1979). In termination proceedings based on deprivation under § 27–20–44, the burden of proof required is that the deprivation be proved by clear and convincing evidence. *In Interest of M.N.*, 294 N.W.2d 635 (N.D. 1980). We have stated that "the burden is on the person challenging the right of a natural parent to the care, custody, and control of his child, to prove by clear and convincing evidence the existence of all required factors for termination of parental rights." *In Interest of F.H., supra*, 283 N.W.2d at 211. The test for clear and convincing evidence has been defined as evidence leading to a firm conviction or belief that the fact is true. *Zundel v. Zundel*, 278 N.W.2d 123 (N.D.1979).

We believe that the findings of fact by the trial court are supported by substantial evidence in the record and are not clearly erroneous. Rule 52(a), N.D.R.Civ.P. The court found in its Finding of Fact No. XIII that Douglas's occasional attempts to exercise his visitation rights had been abortive, inappropriate, unreasonable, and apparently motivated by a desire more to continue a combative relationship with Glenda than by a desire to enjoy the company of his children. Douglas argues that it was Glenda who was the uncooperative person

in their relationship. We conclude that the evidence supports the findings made by the trial court.

The record shows that Douglas sought visitations without making any prior arrangement with Glenda for his visits. The record also shows that Glenda did not refuse visitations to Douglas on the two occasions when he contacted her directly, even on Christmas Eve day of 1976 when he sought visitation without making any prior arrangements. Douglas's testimony at the hearing indicates that he knew that Glenda had made plans for the children for that evening. It was not unreasonable for Glenda to require Douglas to stay for a time at her house so that the children could get to know him better, the children being three and two years old, respectively, and not having seen their father for some time. We agree with the trial court that Glenda properly refused to send the children to Fargo with Mr. Osborne when he telephoned and asked to take them to see Douglas that same day, when no prior arrangements or preparations had been made for such a trip. We also agree with the trial court that it would have been bad parenting on Glenda's part to release the children under these circumstances, notwithstanding the fact that Mr. Osborne was a mutual friend of the parties.

Glenda's refusal to make visitation arrangements with Delores Hoffert when Delores phoned her in 1978 is one instance suggesting uncooperativeness on Glenda's part. Rather than arranging a visit through Delores, Glenda required that Douglas call her himself. Douglas testified that he called Glenda that night but that there was no answer, and he made no other such calls. Testimony as to the reason for making no further calls to Glenda was that the purpose for calling was gone because Douglas could not have the children for Christmas. The record gives no indication of the date in December, 1978, when this phone call was made. Notwithstanding such absence in the record, Douglas's testimony suggests that he was seeking visitation only for Christmas. We can understand a father wishing to see his children on Christmas but we cannot accept his failure to attempt to see them at another time as evidence of a desire to see his children for their own sakes. His failure to make further phone calls indicates that the timing of this particular proposed visit with his children was more important than a visitation in itself.

The record is also unclear as to whether or not Delores Hoffert telephoned Glenda on her own or whether she made the call at the request of Douglas.

Douglas testified that he made no further calls until August, 1980, because he was emotionally upset when Glenda told him that he could not visit the children. This is unpersuasive in light of the facts which show that on the two occasions when he directly contacted Glenda for visitation rights, he was not refused. The refusals to Mr. Osborne and Delores Hoffert were not of a type suggesting that Douglas would be refused visitation rights had he contacted Glenda directly. We do not mean to suggest, however, that visitations can never be arranged through third persons in all cases. For this case only we are stating that Douglas's direct attempts at visitations were never refused. That the visits attempted to be arranged for Douglas by third persons were unsuccessful do not conclusively establish that Douglas would be refused his direct request to Glenda to arrange visitation with his children, especially in the light of Douglas's two visits which were allowed by Glenda, one of which was allowed with no prior arrangements having been made. Therefore, after reviewing the evidence as a whole, we conclude that the trial court's Finding of Fact No. XIII was not clearly erroneous. Rule 52(a), N.D.R. Civ.P.

The trial court found in its Finding of Fact No. XI that Glenda had never refused or denied Douglas the reasonable exercise of his visitation rights with his children. The record indicates that both times Douglas had contacted Glenda himself to visit the children he was not denied and that Glenda had turned down Mr. Osborne and

Delores Hoffert, who had both attempted to arrange for the children to visit Douglas.

As we have previously stated, the attempts by Mr. Osborne to take the children to see Douglas without prior arrangements having been made was inappropriate and was properly refused by Glenda. Glenda's refusal to arrange visitations through the efforts of Delores Hoffert, although suggesting uncooperativeness on Glenda's part, is not necessarily a refusal or denial of visitation rights to Douglas. There was no later contact between Douglas and Glenda for us to categorize as a refusal. Douglas testified that he phoned later that night but that no one answered his telephone call. Glenda testified that she never received a telephone call from Douglas that night and she did not remember whether or not she had left the house that night. It is for the trier of fact to resolve these kinds of conflicts in testimony. In the absence of at least another or a series of unanswered telephone calls by Douglas, we cannot say that there were insufficient facts surrounding this incident to constitute a refusal or denial by Glenda of visitation to Douglas. After reviewing this evidence, we are not left with a definite or firm conviction that a mistake has been made. *Haberstroh v. Haberstroh*, 258 N.W.2d 669 (N.D.1977).

In the trial court's Finding of Fact No. X, the court found that Douglas was aware in January of 1979 that the adoption action had commenced. Finding No. X further points out Douglas's regular child support record, including $50 for arrearages each month from January 29, 1979, until the adoption proceeding in August, 1980. Douglas attacks this finding because apparently Finding No. X implies that Douglas was making payments only because he knew the adoption proceeding had been commenced.

The evidence in the record indicates that Douglas was not served with the petition commencing the adoption action until February 14, 1979. However, the petition for adoption in this case was signed by the Gotvaslees on January 23, 1979. The order for hearing on the adoption was signed by the Honorable Ray R. Friederich on January 29, 1979, the same day on which Douglas was brought before Judge Friederich for hearing on the request for contempt citation by the state's attorney for nonsupport. The court's order on the request for contempt citation provided that Douglas pay $150 at the time of the hearing, and if Douglas again became in arrears the clerk was to notify the sheriff, who was to immediately take Douglas into custody, at which time he would serve a six-month sentence provided by the court in an earlier order dated August 19, 1976.

By contesting Finding of Fact No. X, Douglas is trying to show that he was making his support payments voluntarily before commencement of the adoption proceedings, which would indicate that he did not intend to abandon his children. The facts, however, convince us that Douglas's payments were not made voluntarily. The record shows that the payments made on January 29, 1979, and thereafter were made pursuant to a court order with a six-month jail sentence for failure to pay. The record further shows that between June of 1975 and January 29, 1979, Douglas was subject to arrearage notices along with two contempt citations and three bench warrants for failure to make his child support payments. We believe that the facts show that Douglas's support payments were not voluntarily made but, rather, were made under compulsion of the court's orders.

We agree with the trial court's findings of fact. Rule 52(a), N.D.R.Civ.P., states, in pertinent part, that: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." In *Kee v. Redlin*, 203 N.W.2d 423, 431 (N.D.1972), this court stated, in discussing Rule 52(a):

"In applying this rule this court must give great weight to the findings made and the inferences drawn by the trial judge. The mere fact that we may have reached a different result does not justify us in setting the findings aside. We will do so only if we find, based on all the

evidence, that the findings are clearly erroneous. 9 Wright & Miller, Federal Practice and Procedure, § 2585."

The trial court had the advantage of firsthand observation of the witnesses and their demeanors, thus providing the court with a more favorable vantage point from which to determine the facts as opposed to our review of a cold record. From our review of the record subject to the "clearly erroneous" rule imposed by Rule 52(a), N.D. R.Civ.P., we cannot say that the trial court's findings are clearly erroneous.

In addition to attacking the trial court's findings of fact, Douglas argues that the facts and circumstances of this case do not sustain by clear and convincing evidence the trial court's finding of abandonment. Douglas further argues that there was no finding by clear and convincing evidence that he had an *intent* to abandon his children and cites *In re Adoption of Christofferson*, 89 S.D. 287, 232 N.W.2d 832, 834 (1975), which states:

"Appellant here [Christofferson] questions the legal sufficiency of the evidence and principally argues that there was no showing of intent to abandon on his part. We agree that it is necessary to establish an intent to abandon and to relinquish parental obligations. An involuntary inability to assume a parental role will not constitute abandonment. *Moody v. Voorhies*, 1970, 257 Or. 105, 475 P.2d 579. Most courts have interpreted similar statutes as requiring an intentional abandonment. *In re Adoption of Snellgrose*, 1967, 425 Pa. 258, 228 A.2d 764; *Pitzenberger v. Schnack*, 1932, 215 Iowa 466, 245 N.W. 713; *In re Anderson*, 1933, 189 Minn. 85, 248 N.W. 657. As is generally the case, intent to abandon may be inferred from conduct. *Moreau v. Buchholz*, 1951, 124 Colo. 302, 236 P.2d 540."

In *Christofferson, supra,* the South Dakota Supreme Court terminated the parental rights of the appellant who failed to make child support payments, despite his ability to do so. The appellant in *Christofferson*, like Douglas in the instant case, had some few communications with his children. However, the South Dakota Supreme Court stated that these few communications did not in themselves negate a finding of abandonment and that failure to pay support when apparently able to do so was a strong factor in establishing abandonment. Douglas distinguishes the instant case from *Christofferson* on the fact that the appellant in *Christofferson* was gainfully employed during the times he failed to make his payments. Douglas, on the other hand, contends that his failure to make support payments generally coincided with his periods of unemployment. We agree that the instant case is distinguishable from *Christofferson* with respect to the employment of the respective appellants. Nevertheless, we believe that such single distinguishing factor does not negate the applicability of the principle enunciated in *Christofferson* in the instant case, because failure to pay support is not the only factor in a determination of abandonment. Other factors include a parent's presence, love, care, and affection. *In re Adoption of Christofferson, supra,* 232 N.W.2d at 834. We agree that in order to prove an abandonment of one's children an intent to abandon is necessary. In the present case, the trial court specifically concluded at the close of the hearing that there was "an objectively determined intent on the part of the respondent Douglas Ray Hoffert not to exercise his rights as a parent". In addition, the trial court's written findings of fact, conclusions of law, and order for judgment stated that Douglas Ray Hoffert had abandoned his children. Furthermore, we conclude that an intent to abandon is inherent in the definition of abandonment. *See* Black's Law Dictionary (5th Ed.).

To show that he did not intend to abandon his children, Douglas directs our attention to his support payment record, particularly his payments made after January 29, 1979. Although Douglas made some support payments subsequent to his divorce from Glenda, the record indicates that prior to the adoption hearing, his payments were made under the cloud of arrearage notices, two contempt citations, and three bench

warrants. When Douglas began on January 29, 1979, to regularly pay his $100 per month for child support, along with $50 per month for arrearages, he was subject to a court order providing for a six-month jail sentence if he failed to make his payments. Prior to January 29, 1979, Douglas had made no support payments since October 19, 1977, a period of over fifteen months. The trial court found, and the record shows, that Douglas did not make any payments in 1978 even during the times that he was employed.

We believe that the record shows that Douglas's support payments were not made in an effort to continue his parental responsibilities, but, rather, were made to avoid serving a six-month jail sentence. Although Douglas made his support payments generally during his periods of employment and was clearing up his arrearages, we cannot say that such payments alone negate a finding of abandonment. In *Kottsick v. Carlson*, 241 N.W.2d 842, 852 (N.D.1976), in affirming a trial court's dismissal of an adoption petition we stated that we are not fully convinced that a natural father's making financial contributions for his children is the controlling criterion. *Id.* at 852. Douglas's brief cites *In re Adoption of Christofferson, supra*, for the proposition that failure to pay support is not, in itself, ground for a finding of abandonment. We believe, however, that his reliance upon *Christofferson* is misplaced. Just as a failure to pay support does not, in itself, constitute abandonment, involuntary payment of support, in itself, is not enough to avoid a finding of abandonment.

Notwithstanding Douglas's support payment record, of great importance is the matter of his lack of contacts and communications with his children. The instant case is similar to the case of *Lambertus v. Santino*, 608 S.W.2d 502 (Mo.App.1981), wherein a father's parental rights were terminated despite his having made substantial payments of child support over a period of years. The court in *Lambertus, supra* 608 S.W.2d at 506, stated:

"If appellant had timely made every payment he would be entitled to no special credit, because these payments were not voluntarily made. They were made under compulsion of a court order. He was doing only what he had to do. More to the point, more important than sending money, is the matter of communication—communication of love and affection by a parent to a child; the parent's expression of interest in the child and his world; the communicated desire to be in the child's company whenever possible; the development of a commonality of interest and an empathy with him. These are the things that count heavily in a situation where by force of circumstances personal visitation is impossible."

Other factors for termination of parental rights to be considered are "the attitude, conduct, ability, and such other matters relating to the parent's duties, responsibilities, and care for the child". *Kottsick v. Carlson, supra* 241 N.W.2d at 853. Additional factors include a parent's presence, love, care, and affection. *In re Asterbloom's Adoption*, 63 Nev. 190, 165 P.2d 157 (1946). Therefore, weighing heavily against Douglas's record for making his support payments are the minimal contacts he has had with his minor children since his separation from Glenda in 1975.

In the present case the trial court found that Douglas visited his children only twice between June of 1975 and August of 1980. Two other attempts were made through Mr. Osborne and Douglas's second wife, Delores Hoffert. A third attempt was made after the adoption proceeding had begun, and Glenda refused visitation to Douglas on the advice of her counsel pending completion of the adoption proceeding.

The trial court found Douglas's attempted contact with the children through Mr. Osborne to be inappropriate. The court indicated that it would have been bad parenting on the part of Glenda to have released the children to Mr. Osborne without any prior arrangements having been made for such a visit. We agree.

When Delores Hoffert contacted Glenda regarding a visit with the children, assuming that Douglas made a subsequent phone call that night to Glenda, his failure to make any further attempts to contact Glenda for purposes of arranging a visit with the children indicates little or no resolve on his part to enforce his visitation rights. The record also shows that Douglas made no attempts to visit his children at a time when he was unemployed and living with his parents in Granville, North Dakota, only twelve miles from the place where his children were living. He also made no attempt prior to the adoption proceeding to get a court order to enforce his right to reasonable visitation, which was provided in his decree of divorce from Glenda.

We agree with the trial court that Glenda has not always cooperated in facilitating Douglas's attempts to exercise his visitation rights, but that her occasional failure to cooperate has been insufficient to explain or justify Douglas's failure to maintain contact with his children.

■ We recognize that there is a heavy burden which the law places on a person wishing to adopt a child against the consent of a parent. Nevertheless, we are also mindful of the welfare of the child. As we stated in *In Interest of F. H.*, 283 N.W.2d 202, 213–214 (N.D.1979):

> "We have said that in adjudicating the issue of parental rights with respect to children, the primary consideration is the welfare of the child. *Waagen v. R.J.B.*, 248 N.W.2d 815 (N.D.1976); *In re J.V.*, 185 N.W.2d 487 (N.D.1971). Certainly, the child's welfare is the purpose of the proceeding. This is so regardless if the termination proceeding is based on grounds of abandonment, continued deprivation, or consent. Sections 27–20–01, 27–20–44, NDCC."

The obvious purpose of terminating parental rights in connection with an adoption proceeding is to provide a child with a real parent instead of one whose conduct proves him to be a parent by blood only. We believe that the unexercised rights of a parent to a child are not to be enforced to the detriment or destruction of the happiness and wellbeing of the child. *In Interest of F.H., supra* 283 N.W.2d 214. Our statutes provide a child with an opportunity to experience the benefits of having a real parent by adoption by petitioners who demonstrate true love, affection, and care for the child regardless of the arbitrary opposition by a natural parent whose conduct shows such parent to have abandoned the child.

■ The trial court stated in its conclusions of law that Douglas abandoned his children and Douglas contends that, as a conclusion of law, the question of abandonment is fully reviewable by this court. Notwithstanding the trial court's label, we reject the contention that the question of abandonment is one of law. It is a question of fact. *In re Carson*, 76 Nev. 446, 357 P.2d 591, 593 (1960); *Mastrovitch v. Mavric*, 66 S.D. 577, 287 N.W. 97, 98 (1939). Whether a parent has abandoned a child is determined by the facts of each case and a finding of abandonment will be upheld on appeal where there is substantial evidence in the record to support that finding. *Pyborn v. Quathamer*, Nev., 605 P.2d 1147 (1980).

■ It is undisputed that Douglas made no support payments between October, 1977, and January, 1979, even though he was employed during a part of that period of time; that he did not make any contacts or attempted contacts with his children between December of 1978 and the commencement of the adoption proceeding on January 29, 1979; that no Christmas or birthday cards or gifts were sent to the children from 1976 to 1980; that Douglas made only two attempted visits, through efforts of Mr. Osborne and Delores Hoffert, and another attempt in August of 1980 after the commencement of the adoption proceeding; and that from 1975 to 1980 Douglas had only two visitations with the children.

We conclude that there is substantial evidence in the record for the trial court's finding of abandonment and we affirm its judgment terminating the parental rights

of Douglas Ray Hoffert in and to the minor children, Donavon Ray and Dayton John.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.